# United States Court of Appeals
## For the First Circuit

No. 05-1598

UNITED STATES OF AMERICA,

Appellee,

v.

LAWRENCE MAHER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella, Circuit Judge,
Hug,[*] Senior Circuit Judge,
and Lynch, Circuit Judge.

Chauncey B. Wood, with whom Shea, Larocque & Wood, LLP was on brief, for appellant.
Margaret D. McGaughey, Appellate Chief, District of Maine, with whom Paula D. Silsby, United States Attorney, was on brief, for appellee.

July 6, 2006

[*]Of the Ninth Circuit, sitting by designation.

**LYNCH**, **Circuit Judge**.  Lawrence Maher, an erstwhile Massachusetts drug dealer supplying cocaine to southern Maine, was the subject of a police sting operation.  While under surveillance on July 22, 2004, Maher wandered drunkenly around a public parking lot in Old Orchard Beach, Maine, calling out the name of a potential drug buyer.  He then got in his van, which contained drugs, and fell asleep at the wheel with the key in the ignition and an open beer can beside him.

The police, well aware of the opportunity created, naturally investigated.  They arrested Maher for the state crime of operating under the influence (OUI) after Maher failed field sobriety tests.  Incident to arrest, they searched Maher's person and van and found heroin, cocaine, and drug paraphernalia.  Maher's luck was no better at trial.  He was found guilty of the federal crime of possession of cocaine with intent to distribute.  See 21 U.S.C. § 841(a)(1).  On April 6, 2005, he was sentenced to 262 months in prison and six years' supervised release.

On appeal Maher makes an easily disposed-of Fourth Amendment claim, which is significant largely because we reject his legal argument that reasonable suspicion of drunk driving cannot exist where the would-be operator is asleep and the vehicle is off.  Of more significance is his argument, under Crawford v. Washington, 541 U.S. 36 (2004), that the prosecution may not evade strictures on admission of testimonial out-of-court statements by non-

testifying declarants on the basis that the statements are offered only for context.  While concerned about the prosecution's use of such evidence here, we find no basis to reverse the conviction.

I.

We recount the facts.  As to those facts relevant to the suppression issue, we rehearse the findings of the magistrate judge, consistent with record support.  See United States v. Romain, 393 F.3d 63, 66 (1st Cir. 2004).

On July 20, 2004, Officer Ernest MacVane, a Windham, Maine, police officer assigned to a task force of the United States Drug Enforcement Administration (DEA), arrested one William Johnson on cocaine charges.  Johnson told Officer MacVane that he had bought his cocaine from Maher, who lived in Massachusetts and was a significant trafficker in southern Maine.

Johnson agreed to assist in a staged drug transaction with Maher.  He was told that his telephone calls with Maher would be monitored and recorded.  Johnson called Maher on July 20 and asked if Maher was "coming down here again."  Maher replied, "tomorrow I hope, yeah."  The following exchange ensued:

> Maher:      [D]o you got any numbers?
>
> Johnson:    What's that?
>
> Maher:      One, two, three (unintelligible).
>
> Johnson:    Four.
>
> . . . .

-3-

Maher:          Okay, buddy.

After some discussion of whether Johnson might come to Massachusetts instead, Maher told Johnson, "I got you down for four either way." He did not explicitly mention cocaine.

On the night of July 21, DEA Agent Kate Barnard called Maher to set up a separate meeting.[1] She told Maher she was "Sue," and said she wanted to "hook up" so that she could "get something." Maher, apparently thinking she was an acquaintance,[2] agreed to meet her at Radley's Market in Old Orchard Beach. The next morning, Johnson called Maher to discuss meeting. Maher told Johnson he was waiting for a friend at a store (an apparent reference to Radley's Market) and told Johnson to call back.

Later that morning, DEA Agent Paul Buchanan saw Maher wandering in the parking lot adjacent to Radley's Market, stumbling and calling the name "Sue."[3] Agent Buchanan watched Maher enter the market and emerge minutes later. Maher appeared intoxicated to Agent Buchanan, who said he was still stumbling and disoriented.

Maher climbed into the driver's seat of a white minivan.

---

[1] At a suppression hearing, Officer MacVane testified that Agent Barnard did so to "try to get Mr. Maher to commit to a location that we could locate him and find him."

[2] When the agent told Maher she was "Sue," he asked her if she was "Sue Conley." The agent replied in the affirmative. The name Sue Conley was later found in an address book recovered from Maher's van.

[3] Agent Buchanan recognized Maher from, inter alia, a previous booking photograph that he had been shown.

About ten minutes later, Agent Buchanan approached the minivan and saw Maher asleep or unconscious, slumped in the driver's seat. No one else was in the van. The keys were in the ignition, though the engine was not running. This information was relayed to Old Orchard Beach Police Officer Gerald Hamilton.

Officer Hamilton drove to Radley's Market and approached the minivan. He spoke to Maher, but Maher did not wake up, so Officer Hamilton reached through the window and shook Maher to rouse him. The officer asked Maher if he was okay, and Maher replied that he was just leaving. Officer Hamilton observed that Maher had droopy eyes and spoke in a mumble.

Officer Hamilton could see an open beer can in the minivan's console and a six-pack on the passenger seat. He asked Maher if he had drunk alcohol or used drugs. Maher replied that he had had only about two ounces of beer and that he did not use drugs. Officer Hamilton told Maher he should not have driven. Maher replied that Officer Hamilton was right; he asked the officer to "cut [him] a break" and said he would find his way to a friend's house. Officer Hamilton then ordered Maher out of the van and conducted three field sobriety tests. Maher failed all three and was arrested on suspicion of OUI. See Me. Rev. Stat. Ann. tit. 29-A, § 2411.

During a search incident to arrest, Officer Hamilton found in Maher's pocket a large roll of currency, totaling $7,902,

and a film canister containing approximately half a gram of what was later determined to be heroin. In the van, police found a black canvas bag which contained three sandwich bags, each of which held a ball of white powdery material slightly smaller than a baseball. The substance was later determined to be 163 grams of cocaine.[4] The canvas bag also held a black digital scale. Additionally, it contained a Post-It note which listed several names; to the right of each was a number. The first name was Johnson's. To the right of his name was the number "4."

Prior to trial, the defense filed a motion to suppress the evidence seized from Maher's van. The defense argued that even assuming Maher was intoxicated, Officer Hamilton had lacked any reason to think Maher had committed OUI.

After a suppression hearing during which Officers MacVane and Hamilton testified, the magistrate judge recommended on October 27, 2004, that the motion to suppress be denied. The magistrate judge noted that under Maine law, an officer may order field sobriety tests on reasonable suspicion of OUI. He also noted that attempted operation counts as operation under the Maine OUI statute. See Me. Rev. Stat. Ann. tit. 29-A, § 2401(6). The magistrate judge catalogued the evidence that Maher was intoxicated before entering the minivan and found that when awakened, Maher

_____

[4] Officer MacVane testified, accurately, that there are approximately 28 grams in an ounce. This means the cocaine seized from the minivan weighed almost six ounces.

-6-

both admitted that he had driven and said he was "just leaving." The court concluded: "This was sufficient evidence, together with the rational inference that the defendant had entered the vehicle in order to drive it, to justify . . . the field sobriety tests." The district court adopted this decision and denied the motion to suppress.

At trial, the government never called the informant, Johnson, as a witness. It did, however, introduce the drugs seized from the minivan and testimony that the amount of cocaine seized far exceeded the amount one might have for personal use. The parties stipulated that the substance seized from the minivan was cocaine weighing 163.7 grams.

## II.

A.        The Motion to Suppress

Maher first challenges the district court's denial of his motion to suppress the evidence seized in the minivan. "Our review of the ultimate determinations of probable cause and reasonable suspicion on a motion to suppress is de novo." United States v. Scott, 270 F.3d 30, 39 (1st Cir. 2001) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)). "[S]ubsidiary factual findings are reviewed for clear error, 'giv[ing] due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" United States v. Burhoe, 409 F.3d 5, 9-10 (1st Cir.

2005) (second alteration in original) (quoting <u>Ornelas</u>, 517 U.S. at 699).

Maher argues that the totality of the circumstances did not create reasonable suspicion that he had committed, or was about to commit, the state crime of OUI. He argues that the absence of reasonable suspicion breaks the chain of circumstance that permitted the drug seizure: Without reasonable suspicion, Officer Hamilton had no basis to require sobriety tests; without the tests, Officer Hamilton had no probable cause to arrest Maher for OUI; without the arrest, there was no reason to search the van.

We reject this argument at its starting point. Assuming arguendo that "reasonable suspicion" is the applicable legal standard,[5] it was met on these facts.

---

[5] Neither the Supreme Court nor this court has decided what quantum of suspicion is required before a police officer can order a motorist to perform field sobriety tests. The Maine courts, however, have adopted the "reasonable suspicion" standard first articulated in <u>Terry</u> v. <u>Ohio</u>, 392 U.S. 1 (1968). <u>See</u> <u>State</u> v. <u>Wood</u>, 662 A.2d 919, 920 (Me. 1995). Other states' courts have reached the same conclusion, <u>see</u> <u>Rogala</u> v. <u>District of Columbia</u>, 161 F.3d 44, 52 (D.C. Cir. 1998) (collecting cases), as has at least one of our sister circuits, <u>see</u> <u>id.</u> ("[T]his Court is persuaded by the reasoning of the courts in those states that have concluded that a field sobriety test is such a minimal intrusion on the driver of the car that only reasonable suspicion is required to conduct such a test."). The parties to this appeal agree that reasonable suspicion is the applicable standard, and so we proceed on that basis for present purposes. <u>See</u> <u>Adorno</u> v. <u>Crowley Towing & Transp. Co.</u>, 443 F.3d 122, 126 (1st Cir. 2006) (accepting arguendo a legal proposition agreed to by the parties).

Reasonable suspicion, a less demanding standard than probable cause, denotes at least a minimal level of objective justification for a stop. United States v. Sokolow, 490 U.S. 1, 7 (1989). In evaluating whether reasonable suspicion is present, we "look at the totality of the circumstances . . . to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

In this case, Officer Hamilton knew (because he had been told by other officers) that Maher had just been stumbling disorientedly, a common characteristic of intoxication, around the parking lot of Radley's Market. See United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997) (police may "rely upon each other's knowledge of facts" when forming suspicions of wrongdoing). Officer Hamilton saw Maher slumped over the wheel of his van in a public lot, apparently not conscious, in the middle of the day. The officer saw an open can of beer next to Maher; Maher did not respond to verbal attempts to wake him up. And when Maher did wake up, he had droopy eyes and mumbled his words. Officer Hamilton had a reasonable basis to think Maher was intoxicated.

But Maher's mere intoxication is not what led to the search of the car. The search was justified on the basis of reasonable suspicion that the crime of OUI had been committed,

which led to the sobriety tests, which led to the arrest. Officer Hamilton knew Maher was the only occupant of the minivan, that he was in the driver's seat, and that the key was in the ignition. He knew Maher's vehicle was parked in a state other than his home state. The inference was entirely rational that Maher had driven while intoxicated and that he would drive again. See United States v. Escobar-de Jesus, 187 F.3d 148, 175-76 (1st Cir. 1999) (a factfinder may make inferences in light of "human experience"); see also United States v. McFarland, 445 F.3d 29, 32 (1st Cir. 2006). Furthermore, Maher told Officer Hamilton he was "just leaving" and asked the officer to cut him a break (suggesting he knew he had broken the law). Maher also tacitly admitted, by agreeing with Officer Hamilton's statement that he should not have driven, not only that he had driven recently but that he had driven drunk.[6]

Maher's key legal argument is that "courts seem to require that a sleeping defendant be found behind the wheel . . .

----

[6] Maher argues that Officer Hamilton had no reason to believe he had consumed alcohol before driving to the parking lot, and that the presence of the six-pack in fact raises the inference that he had not. Maher also relies on the fact that no officer saw him driving the van. These arguments do not alter our conclusion that the other evidence amply supported the police action. See State v. Merrill, 552 A.2d 551 (Me. 1989) (mem.) (upholding defendant's OUI conviction on circumstantial evidence because such evidence "is no less conclusive than direct evidence in supporting a conviction"). Officer Hamilton had ample reason to believe, especially given Maher's statements upon awakening, that Maher had driven while drunk or was planning to drive away while drunk. See Me. Rev. Stat. Ann. tit. 29-A, § 2401(6) (defining "operating" as "operating or attempting to operate a motor vehicle" (emphasis added)).

-10-

with a running engine before they will find reasonable suspicion of OUI." We reject any argument that reasonable suspicion of OUI cannot exist when an apparently intoxicated person is found asleep behind the wheel unless the engine is running. Fourth Amendment analysis is always context-specific and rarely employs litmus tests.[7] See Brigham City v. Stuart, No. 05-502, 2006 WL 1374566, at *4, *5 (U.S. May 22, 2006) (noting that "the ultimate touchstone of the Fourth Amendment is 'reasonableness'" and concluding a warrantless entry was "plainly reasonable under the circumstances").

B.        The Confrontation Clause Challenge

Maher argues there were twelve instances at his trial in which hearsay was erroneously admitted, and that consequently he is entitled to a new trial. He lumps them together and argues that the admission of the testimony violated his constitutional rights

---

[7] Maher makes an additional argument in his reply brief that his incriminating statements cannot be used in the reasonable suspicion calculus because, at the moment Officer Hamilton shook him awake, he was "seized." This argument, not raised before the reply brief, is forfeited. See United States v. Isler, 429 F.3d 19, 30 n.12 (1st Cir. 2005). Even if not forfeited, it would fail. Just because Maher was so soundly asleep (or unconscious) that Officer Hamilton had to shake his arm to wake him up does not mean he was "seized" within the meaning of the Fourth Amendment. While physical touching "might indicate a seizure," United States v. Mendenhall, 446 U.S. 544, 554 (1980), it is only one of many possible factors, none dispositive, United States v. Smith, 423 F.3d 25, 30 (1st Cir. 2005). Here, there is no indication that Officer Hamilton's physical contact with Maher lasted longer than was necessary to awaken him. Furthermore, none of the other exemplary circumstances listed by the Mendenhall court that might suggest seizure were present. See 446 U.S. at 554.

-11-

under the Confrontation Clause of the Sixth Amendment, as defined in Crawford v. Washington, 541 U.S. 36 (2004). He did not object to the majority of this testimony, and he cannot show plain error. Where he did object, no Confrontation Clause issue is presented.

Post-Crawford, the admission of non-testifying informants' out-of-court testimonial statements, through the testimony of police officers, is a recurring issue in the courts of appeals. Crawford holds that a declarant's "testimonial" out-of-court statement is not admissible under the Confrontation Clause unless (1) the declarant testifies, id. at 53-54, or (2) the defendant had a prior opportunity for cross-examination and the declarant is unavailable, id. at 54, or (3) the evidence is admitted for purposes other than establishing the truth of the matter asserted, id. at 59 n.9. Each of these tests has its own subtleties.

Assuming the declarant does not testify and is in fact available, and/or there was no prior opportunity for cross-examination of the declarant, Crawford claims will usually turn on one of two issues. First, was the out-of-court statement testimonial? Second, if so, is it admissible for reasons other than the truth of the matter asserted?

There has been a great deal of attention to the first issue, which this court discussed in United States v. Brito, 427 F.3d 53 (1st Cir. 2005). In Crawford, the Supreme Court did not

precisely define what it meant by "testimonial." It instead listed, for illustrative purposes, three formulations that came within the "core class" of testimonial statements. 541 U.S. at 51-52. The first includes "ex parte in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially." Id. at 52 (emphasis added). The second includes "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions." Id. at 51-52 (internal quotation marks omitted) (omission in original) (citing White v. Illinois, 502 U.S. 346, 365 (1992)). The third encompasses "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 52 (internal quotation marks omitted). This court, applying Crawford, has said a statement is testimonial if a reasonable declarant, similarly situated, would have the capacity to appreciate that the statement is of a sort typically "preserve[d] . . . for . . . potential prosecutorial use." Brito, 427 F.3d at 60-61 (holding that 911 calls may be testimonial in certain circumstances).

There has been somewhat less development, post-Crawford, of the second issue, perhaps because this Crawford exception appears simply to rest upon a long-established exception to the hearsay rule for statements not offered for the truth of the matter.  Even before Crawford, however, it was recognized in the standard treatises' discussions of the hearsay rule that:

> One area where abuse may be a particular problem involves statements by arresting or investigating officers regarding the reason for their presence at the scene of a crime. The officers should not be put in the misleading position of appearing to have happened upon the scene and therefore should be entitled to provide some explanation for their presence and conduct.  They should not, however, be allowed to relate historical aspects of the case, such as complaints and reports of others containing inadmissible hearsay.  Such statements are sometimes erroneously admitted under the argument that the officers are entitled to give the information upon which they acted.  The need for this evidence is slight, and the likelihood of misuse great.  Instead, a statement that an officer acted "upon information received," or words to that effect, should be sufficient.

2 Broun, et al., McCormick on Evidence § 249, at 103 (5th ed. 1999) (emphasis added).

Maher's Crawford arguments appear to cover two different types of testimony by officers concerning statements by the non-testifying informant-declarant: (1) testimony that the informant said X to the officer, and (2) testimony from which (Maher argues) the jury would necessarily infer that the declarant had said X, but

-14-

which did not itself quote or paraphrase the declarant's statements. <u>Crawford</u> covers the first category -- the admission of out-of-court statements by non-testifying and un-cross-examined declarants through testimony of others. Maher makes no effort to explain why <u>Crawford</u> should be read to extend to the second category, and so we disregard the statements which fall in that category.

We address Maher's strongest argument that the testimony violated <u>Crawford</u>. Early in the government's case, the prosecutor asked Officer MacVane how he found out that Maher "may be involved in illegal activity." There was no objection. Officer MacVane replied: "William Johnson." Moments later, the prosecutor and Officer MacVane engaged in the following colloquy:

> Q: [B]ased on Bill Johnson's response to your questions about who gave him the cocaine, did you do follow-up inquiries regarding whether such a person existed?
>
> A: Yes I did.
>
> Q: What did you do on those lines?
>
> A: I checked the name Lawrence Maher in the State of Maine Department of Motor Vehicle database and also the Massachusetts database and found that he existed in both of them.

Again, there was no objection.

Obviously concerned about the use the jury might make of this testimony, the trial court admirably and sua sponte instructed: "The statements made by Mr. Johnson, whatever they

-15-

are, that is for you to decide, are not to be used by you as to the truth of those statements. They are merely to be used as something that he responded to by doing something else." The court then gave the jurors an example of the difference between hearsay and non-hearsay use of a statement.

The first <u>Crawford</u> issue to be addressed is whether the informant's statement that Maher was involved in illegal drug dealing activity was testimonial. As best we can tell from the record, it was testimonial. The Supreme Court's first formulation of "testimonial" included custodial examinations. <u>Crawford</u>, 541 U.S. at 52. The Court said "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." <u>Id.</u> The statement at issue here was made while the police were interrogating Johnson after Johnson's arrest for drugs; Johnson agreed to cooperate and he then identified Maher as the source of the drugs. Johnson's statement is also testimonial under <u>Crawford</u>'s third example of the "core class" of testimonial statements. The cooperation agreement, indeed, made it more likely the statement would be used prosecutorially.[8] In this context, it

---

[8] In <u>United States</u> v. <u>Cromer</u>, 389 F.3d 662 (6th Cir. 2004), the Sixth Circuit noted with approval one commentator's suggestion that "'[a] statement made knowingly to the authorities that describes criminal activity is almost always testimonial.'" <u>Id.</u> at 675 (quoting Friedman, <u>Confrontation: The Search for Basic Principles</u>, 86 Geo. L.J. 1011, 1042 (1998)). We would not go so far. Our decision in <u>Brito</u>, 427 F.3d 53, implicitly rejected this view in holding that 911 calls are not testimonial merely because the caller knowingly contacts police to provide information about

-16-

is clear that an objectively reasonable person in Johnson's shoes would understand that the statement would be used in prosecuting Maher at trial. This is sufficient to render the statement testimonial under the test in Crawford and our test in Brito. See, e.g., Crawford, 541 U.S. at 52 (including among its "testimonial" formulations "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial"); Brito, 427 F.3d at 60 (stating that a statement qualifies as testimonial if the declarant would reasonably understand that it will be "preserve[d]" for "potential prosecutorial use"); see also Horton v. Allen, 370 F.3d 75, 84 (1st Cir. 2004) (finding a declarant's statements non-testimonial where they "were not made as part of a confession resulting from custodial examination" but instead as part of a private conversation with a non-police officer); United States v. Saget, 377 F.3d 223, 228 (2d Cir. 2004) (noting that the "core" examples of testimonial statements in Crawford "all involve a declarant's knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings").

---

a crime. Where the caller is "under the stress of a startling event" such that she cannot "comprehend the larger [prosecutorial] significance of her words," the call may not be testimonial at all. Id. at 61, 62.

-17-

The next question is whether Officer MacVane's testimony about Johnson's testimonial statement was admissible under Crawford for reasons other than the truth of Johnson's assertion that Maher sold him illegal drugs. The government says it was admissible for reasons other than the truth of the matter because it set the context for what the police officers did next. Sometimes the rationale that an out-of-court statement provides context for other admissible evidence will be valid. In United States v. Walter, 434 F.3d 30 (1st Cir. 2006), this court held that Crawford was not offended by use of an informant's statements to set context. But the precise nature of that context is important. In Walter, the evidence in question was tape-recordings made during a sting operation during which the informant bought weapons from the defendant. Certain portions of the tapes, with statements by a non-testifying informant, were admitted because the informant's words provided context for admissions made by the defendant, which also were captured on tape. Id. at 33-34.

This situation is very different and more directly raises the risks which concerned the Crawford court. The government's articulated justification -- that any statement by an informant to police which sets context for the police investigation is not offered for the truth of the statement and thus not within Crawford -- is impossibly overbroad. It is overbroad even in classic hearsay terms, as stated in the McCormick treatise. What gives

this situation added bite is that the "context" rationale may be used by the prosecution not just to get around hearsay law, but to circumvent <u>Crawford</u>'s constitutional rule. As the Seventh Circuit has warned, citing <u>Crawford</u>:

> Under the prosecution's theory, every time a person says to the police "X committed the crime," the statement (including all corroborating details) would be admissible to show why the police investigated X. That would eviscerate the constitutional right to confront and cross-examine one's accusers.

<u>United States</u> v. <u>Silva</u>, 380 F.3d 1018, 1020 (7th Cir. 2004); <u>see also</u> <u>Cromer</u>, 389 F.3d at 674. In <u>Silva</u>, a DEA agent testified that he listened to conversations between a non-testifying confidential DEA informant and a purported drug supplier, and that he heard the informant speak of "this individual named Juan [who] indicated that he was going to be making the delivery." 380 F.3d at 1019 (alteration in original). The defendant's name was Juan. The government argued that this and similar testimony was admissible to show "the actions taken by each witness." <u>Id.</u> at 1020. But as the <u>Silva</u> court wrote, "[a]llowing agents to narrate the course of their investigations, and thus spread before juries damning information that is not subject to cross-examination, would go far toward abrogating the defendant's rights under the sixth amendment and the hearsay rule." <u>Id.</u> This sort of testimony also raises risks similar to those raised by use of law enforcement officers to

give preliminary overview testimony, a practice we disapproved in United States v. Casas, 356 F.3d 104, 119-20 (1st Cir. 2004).

Here, Officer MacVane testified that the confidential informant had said Maher was a drug dealer, even though the prosecution easily could have structured its narrative to avoid such testimony. The information was surely relevant, but that is not our question. As McCormick points out, the officer, for example, could merely have said he "acted upon information received, or words to that effect." 2 Broun, supra, § 249, at 103 (internal quotation marks omitted). It appears the testimony was primarily given exactly for the truth of the assertion that Maher was a drug dealer and should not have been admitted given the adequate alternative approach.

But Maher did not object to this portion of Officer MacVane's testimony, and he certainly cannot meet the plain error test. The testimony was immediately followed by a sua sponte instruction to the effect that any statements of the confidential informant should not be taken as standing for the truth of the matter asserted (i.e., that Maher was a dealer who supplied Johnson with drugs). Cf. United States v. Jadusingh, 12 F.3d 1162, 1167-68 (1st Cir. 1994) (finding no plain error in a prosecutor's purportedly improper reference to inaudible portions of an audio tape in part because "[t]he trial court provided the jury with a

-20-

limiting instruction directing them to disregard inaudible portions of the tape").

The government needed to prove only that Maher possessed, with the intent to distribute, cocaine. See 21 U.S.C. § 841(a). This was proven by what was in his van: cocaine in amounts too large to be explained by personal use; a digital scale; multiple baggies of drugs (a fact consistent with distribution); a slip of paper with the name of the informant who arranged the buy.[9] Further, the police saw Maher walking around the assigned meeting place for a second potential drug sale, calling out the name he had been given.

The dividing line often will not be clear between what is true background to explain police conduct (and thus an exception to the hearsay rule and thus an exception to Crawford) and what is an attempt to evade Crawford and the normal restrictions on hearsay. But we are on firm ground in warning prosecutors of the risks they face in backdoor attempts to get statements by non-testifying confidential informants before a jury.

---

[9] Officer MacVane offered uncontroverted testimony that a personal use quantity of cocaine is typically a half-gram to a gram, see United States v. Morales, 834 F.2d 35, 36-37 (2d Cir. 1987) (recounting expert testimony that 21 grams of cocaine "was inconsistent with personal use"), and that drug dealers use scales to measure their drugs before sale.

C.        Challenges to Officer MacVane's Post-It Note Testimony

Finally, Maher raises several unpreserved challenges to the admissibility of one subsection of Officer MacVane's testimony; we review for plain error.

The challenged colloquy occurred while the prosecutor was questioning Officer MacVane about the Post-It note found in Maher's minivan, and specifically about the significance of the number "4" scrawled next to Johnson's name:

> Q:   Based on your participation in numerous narcotics cases that you said you had participated in, what significance did this piece of paper have in general with regard to drug trafficking?
>
> A:   Based on my training and experience it was significant because I recognize it as drug notes.  Drug distributors' way of being organized.  In this particular case what it appears to me is a customer list with their orders on it.
>
> Q:   Based on your training and experience and knowledge in this case what did the "four" pertain to?
>
> A:   Four ounces of cocaine.

Maher's argument repeats the familiar debate about whether police officers, in giving certain descriptions about how drug deals work, are testifying on the basis of particularized knowledge under Fed. R. Evid. 701, or as expert witnesses under Fed. R. Evid. 702.[10] See, e.g., United States v. Ayala-Pizarro, 407

---

[10]  Maher also argues that this exchange constituted a Confrontation Clause violation because Officer MacVane's opinion

-22-

F.3d 25, 27-29 (1st Cir. 2005).  If the testimony is properly Rule 702 material, there are two advantages to the defendant.  First, the government must disclose Rule 702 testimony to the defense before trial.  See Fed. R. Crim. P. 16(a)(1)(G).  Second, the defense may be able to convince the judge that the testimony does not meet the heightened reliability criteria under Rule 702 and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  But there is also a possible disadvantage to the defendant, in that jurors may be told that the officer's testimony has been deemed expert.

Rule 701, on the other hand, is meant to admit testimony based on the lay expertise a witness personally acquires through experience, often on the job.  We discussed at greater length the difference under the two rules, as applied to police officer testimony, in Ayala-Pizarro.  See 407 F.3d at 27-29.  We noted in that case that it may be that part of an officer's testimony will be lay opinion and part will be expert opinion.  Id. at 28.

Here Officer MacVane's testimony, that based on his experience the Post-It notes were likely notes of drug orders and the number "4" referred to a quantity of the drug found in the van, "did not cross the line to become expert testimony."  Id.; see also

---

was based not on his expertise, but on Johnson's testimonial statements.  For additional reasons to those already stated, we reject this argument.  Officer's MacVane's experience provided an independent basis for the evidence, as we explain below.

id. at 29 (holding that an officer's testimony that heroin seized at drug points was typically packed in aluminum decks and that the heroin seized in the case was packaged in such decks was Rule 701 testimony). There was no error, much less plain error.

### III.

The other arguments presented by Maher have been considered and are without merit.

The conviction is affirmed.