STATE of Missouri, Respondent,

v.

Terry WASHINGTON, Appellant.

No. ED 90231.

Missouri Court of Appeals,
Eastern District,
Division One.

Aug. 26, 2008.

Matthew M. Ward, Office of the Missouri Public Defender, Columbia, MO, for Appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Richard A. Starnes, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before, KURT S. ODENWALD, P.J., GLENN A. NORTON, J., and PATRICIA L. COHEN, J.

KURT S. ODENWALD, Presiding Judge.

## Introduction

Terry Washington (Defendant) appeals from his conviction, following a jury trial, of first-degree robbery, in violation of Section 569.020.[1] The trial court sentenced Defendant to 20 years of imprisonment. We affirm.

## Background

Defendant was charged by the State of Missouri (State) by Indictment with one count of first-degree robbery and armed criminal action. The Indictment alleged that in December 2005, Defendant forcibly stole U.S. currency in the possession of an agent for National Rent–to–Own, and that Defendant threatened the use of what appeared to be a deadly weapon in the course thereof. The cause proceeded to a jury trial, beginning on May 15, 2007. During the jury trial, Defendant presented no evidence in his defense. The following evidence was presented by the State.

The store manager of the North Oaks National Rent–to–Own location in Nor-

mandy (Victim), testified that he was working on the night before Christmas Eve, December 23, 2005. At about 6:55 p.m., two African–American men walked into the store and straight up to the counter, without looking at any merchandise on the sides of the aisle. Victim, who had been standing in his office door, stepped up to the counter, which was located about five feet away from his office. The cash register and valuable items such as jewelry, camcorders and digital cameras were located at the counter. Victim testified that he stood about a foot and a half away from the men and asked them, "May I help you, please? Are you looking for anything in particular?" He said one of the men responded, "No, we're just looking." Victim said he stood there for a short time, and then the men turned around and walked straight out, again without looking at any merchandise along the aisle.

Victim testified that he looked at the men face-to-face for more than 10 or 20 seconds because he had a short conversation with them and because nothing else was going on at the time. He also had observed them as they walked. Victim had observed that the man on his right was wearing a "pure white stocking cap," which stood out because there was no printing, writing or design on it and he had never seen one like this before. The other man on Victim's left had curls all the way around his head, which reminded Victim of Shirley Temple, under a black hat. When the man walked up to the counter, his nose stood out to Victim because it was "really flat and wide," and Victim noticed his large forehead because his hat was up high. Victim also testified that the man on the left had really white eyes, was stocky but not fat, and that he stood about the same

---

1. All subsequent statutory citations are to RSMo 2000, unless otherwise indicated.

height as Victim, which was five-feet-ten-and-a-half or -eleven-and-a-half inches tall. Victim added that he looked at the men straight on because in his customer-service job, he must make eye contact with the customers to build an "instant relationship."

The next day, December 24, 2005, Victim came into the store at about 7:45 a.m. He sent one of his staff members outside to start the truck and prepare to load it. A few minutes after the store opened at 8:00 a.m., a young African–American woman came into the store looking for a bedroom set. Victim began assisting her, and the woman asked him the price on a bedroom set because there was a scratch on it. Victim turned his back to the woman to look for the scratch but did not see one, and at that time he noticed that she started running. Then Victim noticed the two men that came into the store the previous night. He noticed the one man's smashed nose, stocky body, large forehead, and curls under his black hat, and the other man's pure white hat. He had no doubt that the two men were the same men from the night before because "it just stuck out like a big thumb. I kept the Shirley Temple curls and nose and forehead stuck in my brain because I just seen it yesterday, from the fact they were acting kind of weird coming into the store yesterday." Victim testified that the man with the flat nose and curls had a gun and told him to go to the office. Victim said he immediately put his hands up and walked straight to his office. The man with the gun and flat nose told him to open the safe. Victim obeyed him and put the money on the floor. Then the man with the gun told Victim to give him Victim's wallet and empty Victim's pockets, which Victim did. The man with the gun put into a bag the money from the safe, leaving behind the checks, and Victim's wallet and money. Victim also noticed that he picked up the camcorder and laptop from a chair next to the safe. Next, the men duct taped Victim's hands and eyes and ripped the phone out of the wall. The man with the gun and flat nose told him not to move, and then Victim heard the register's ding and a pitter-patter sound. The men took $1296 from the safe, the laptop worth $586, and $150 cash from the register. Victim made his way to the front of the store, freed himself from the duct tape, and called the police.

Victim testified that he typically drives his car to the bank to deposit money from the previous day between 9:00 a.m. and 9:30 a.m. every day. He also testified that the store's security cameras had not been working for two or three weeks at the time of this incident, and that he had informed the store employees of this fact so they would be aware of everything in the store.

Victim testified that he received a phone call two months after the robbery from a young African–American female who told him that she knew who robbed him. She gave him the names of Demond Taylor (Taylor) and Defendant, who lived on Hamilton. She also said that she knew that they took a laptop and sold it for $500, that the store's drivers did not start work until 9:00 a.m., and that the store's security cameras were not working. Victim said the information regarding the laptop stood out because that information was not released, and only Victim, the store's district manager, and the police knew that the laptop had been stolen. Victim testified that he knew Taylor's name because he was one of the store's drivers at the time, but testified that Taylor was not one of the two men that came into the store on either the night of December 23 or morning of December 24, 2005. The anonymous female told Victim that Taylor had set up the robbery because he was mad at Victim and thought it would be funny. Victim

relayed the information about the phone call to the police. Victim testified that during the same month, he went to the Northwoods Police Department to look at a photo lineup. Officer Nidal Othman (Officer Othman) asked Victim to see if he recognized anyone from the robbery. Victim testified that he looked at all the photos and recognized Defendant as the man with the gun from the robbery. Victim said, "I looked straight down to the very first person I looked at because of the nose and curls. I went right to it." He told the officer he was 98 percent sure that Defendant was the man who robbed him.

During Victim's cross-examination, the court gave the following instruction to the jury:

> With respect to the evidence you heard about statements that the witness had testified he received from a young girl two months later in February, along those lines, you're instructed that with respect to that information that the witness received from the young girl on the telephone, you are not to consider that for the truth of what was told the witness, but simply the basis for any actions that the witness took in calling the police and that the police later took with respect to that information. But you are instructed specifically that it is not for the truth of the information, just the basis of the actions of the people that may have acted on it.

Officer Othman of the City of Northwoods Police Department testified during trial that he had responded to the robbery on the morning that it occurred. He also remembered Victim calling him in February 2006 regarding the anonymous female caller and the information that the caller provided. Officer Othman said Victim gave him the names of the men that the anonymous female caller told him were involved in the December 24, 2005 robbery, and then he constructed a photo lineup including a photo of Defendant. The officer asked Victim then if he could identify anyone in the photo lineup. He said Victim looked at the lineup pictures, placed his finger on Defendant's picture and stated that he was 98 percent sure that this was the person who held the gun at the time of the robbery.

Officer Othman testified that the police initiated surveillance on Defendant's presumed residence after Victim provided police with the information he had received from the anonymous female caller. Despite the surveillance, the police were unable to locate Defendant. About two weeks later, however, Defendant turned himself in to the police. Officer Othman read Defendant his *Miranda*[2] rights, and Defendant completed, initialed, and signed the Northwoods Police Department waiver of rights form. In the interview conducted by another officer, Lieutenant Brady, and in the presence of Officer Othman and Sergeant Carnell, Defendant said that he was involved in a robbery at the National Rent-to-Own with his cousin, Chris Davis, and it involved cash money and a laptop. Defendant also stated to the officers that he had used a fake gun. Additionally, Defendant said he was going to try to get back the laptop, which was in St. Charles now. Defendant then wrote a voluntary statement, which Officer Othman read in court:

> The incident that took place was a robbery which involved money and a laptop that me and my cousin took, my cousin Chris Davis. And I'm trying to get the laptop back in a week.

Defendant told the trial court that he chose not to testify in his defense.

---

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Following his conviction by a jury of first-degree robbery, Defendant was sentenced on June 29, 2007, to serve 20 years of imprisonment. Defendant filed his timely notice of appeal in September 2007 and this appeal follows.

## Point on Appeal

In his sole point on appeal, Defendant alleges that the trial court plainly erred in allowing Victim and Northwoods Police Department Officer Othman to testify about what an anonymous caller told Victim. Defendant claims that this testimony violated his right to confrontation guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Article I, Section 18(a) of the Missouri Constitution because this evidence was inadmissible hearsay. Defendant further asserts that the statements attributed to the anonymous caller were hearsay because the out-of-court statements made by the non-testifying witness were offered by the State for the truth of the matter asserted, that Defendant was one of the individuals who robbed the National Rent–to–Own store. Defendant claims that he suffered a manifest injustice because the statements attributed to the anonymous caller provided a direct link between the robbery and Defendant, and without this link, it is unlikely that Defendant would have been convicted.

## Standard of Review

■ We review a trial court's decision to admit evidence for an abuse of discretion. *State v. Hutchison*, 957 S.W.2d 757, 763 (Mo. banc 1997). Defendant has not properly preserved this point for appeal because Defendant did not object at trial to the testimony of the anonymous female's phone call. A point not properly preserved is reviewed for plain error, with the court's discretion, where a manifest injustice or miscarriage of justice has resulted. Rule 30.20; *State v. Tisius*, 92 S.W.3d 751, 767 (Mo. banc 2002).

If in applying this standard the appellate court chooses to exercise its discretion to conduct plain error review, the process involves two steps. First, the court must determine whether the trial court actually committed evident, obvious and clear error that affected substantial rights.... [I]n the second step of reviewing for plain error, the court must determine whether the evident, obvious and clear error found resulted in manifest injustice or a miscarriage of justice.

*Cohen v. Express Fin. Servs., Inc.*, 145 S.W.3d 857, 864 (Mo.App. W.D.2004).

## Discussion

In his only argument on appeal, Defendant states that he was convicted of robbery in the first degree based on the testimony of three persons, but only two of those persons appeared in court and testified. Defendant argues that the hearsay testimony of the anonymous female caller supported the properly sworn testimony of Victim and Officer Othman, and was the basis of his conviction. Relying on *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) and *State v. Douglas*, 131 S.W.3d 818, 823–24 (Mo.App. W.D.2004), Defendant argues that the police officer's trial testimony regarding the statements of the anonymous female caller was inadmissible hearsay because such testimony went beyond what was necessary to explain subsequent police conduct such that the statements were in fact offered for the truth of the matter asserted.

■ Hearsay evidence is in-court testimony of an extrajudicial statement offered to prove the truth of the matters asserted therein, resting for its value upon the credibility of the out-of-court declar-

ant. *State v. Harris,* 620 S.W.2d 349, 355 (Mo. banc 1981). However, when in-court testimony relating to an out-of-court statement is offered to explain the conduct of the witness who is testifying rather than as proof of the facts asserted in the statement, the testimony does not constitute hearsay. *State v. McCann,* 792 S.W.2d 890, 893 (Mo.App. E.D.1990); *State v. Brooks,* 618 S.W.2d 22, 25 (Mo. banc 1981) (police officer's testimony of informant's observation properly offered to show police officer's conduct); *but see State v. Hoover,* 220 S.W.3d 395, 407 (Mo.App. E.D.2007) (statement to police by defendant's co-conspirator, which the state referenced during its opening statement and was admitted after introduced in police officer's testimony during the state's case-in-chief, was inadmissible); *State v. Shigemura,* 680 S.W.2d 256, 257 (Mo.App. E.D.1984) (court rejects state's position that statement was offered merely to explain subsequent police conduct and not for its truth where statement connected defendant directly to the crime, no limiting instruction was given, and the evidence against defendant was not overwhelming); *Douglas,* 131 S.W.3d at 824 (out-of-court statements that go beyond what is necessary to explain subsequent police conduct are hearsay).

A reasonable concern of this Court is the potential for abuse when out-of-court statements are offered into evidence "not for the truth of the matter asserted" but purportedly to explain "subsequent conduct" that removes the statement from constitutional protections set forth in the Sixth Amendment's Confrontation Clause and the Missouri Constitution. We deem it worthwhile to repeat our admonition against the misuse of police officer testimony regarding an out-of-court declarant's statements that we stated in *Hoover.* In *Hoover,* we quoted the First Circuit in *United States v. Maher,* 454 F.3d 13, 23 (1st Cir.2006), stating:

The dividing line often will not be clear between what is true background to explain police conduct and what is an attempt to evade *Crawford* and the normal restrictions on (and thus an exception to the hearsay rule an thus and exception to *Crawford* ) hearsay. But we are on firm ground in warning prosecutors of the risks they face in backdoor attempts to get statements by non-testifying confidential informants before a jury.

*Hoover,* 220 S.W.3d at 407.

■ The testimony regarding the out-of-court statements of the anonymous caller admitted into evidence in this case potentially raises an issue as to whether the evidence of the out-of-court statements was introduced to prove that Defendant committed the robbery as stated by the anonymous caller, or to explain the subsequent actions of the law enforcement officers in conducting a photo line-up and surveillance of Defendant's residence. This case is distinguished from *Hoover* in that the out-of-court statements of the anonymous caller were offered to explain the subsequent conduct of the law enforcement officers, whereas in *Hoover* the out-of-court statements were offered to explain the subsequent conduct of the defendant. However, we are not required to determine whether or not the out-of court statements of the anonymous female caller are hearsay because the record before us is clear that Defendant was not prejudiced by the admission of such evidence.

■ Even if the testimony of the anonymous caller's statements was hearsay, reversible error requires prejudice to be shown. Error in admitting evidence is not prejudicial requiring reversal unless it is outcome-determinative. *Douglas,* 131 S.W.3d at 824. A finding of outcome-determinative prejudice expresses a judicial conclusion that the erroneously admitted

evidence so influenced a jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion but for the erroneously admitted evidence. Id. Reviewing all of the evidence before us, we are unable to conclude that the jury would have reached a different verdict but for the admission of testimony of the anonymous caller's statements. To the contrary, the record before us points to the inescapable conclusion that the jury would have reached the same verdict even if the out-of-court statements had not been admitted into evidence.

Defendant fails to address the fact that his own sworn statement and confession, as well as Victim's detailed identification of Defendant, provided overwhelming evidence of Defendant's participation in the robbery and was determinative of Defendant's conviction. The testimony of the out-of-court statements of the anonymous female caller did not buttress the Defendant's written confession or the Victim's extremely detailed in-court identification. Notwithstanding the statements from the anonymous female caller, the State presented evidence to the jury of Defendant's positive identification by Victim, as well as Officer Othman's testimony that Defendant turned himself into the police and made a confession with details of the crime for which he was charged. The anonymous female's remarks were consistent with Defendant's own confession that he and his cousin were involved in the robbery and took cash and a laptop. Therefore, Defendant was not prejudiced by the admission of wholly cumulative testimony regarding the anonymous female's call.

Moreover, Defendant did not object to the testimony regarding the anonymous caller's statements at trial. Even if the statements were considered hearsay, the trial court committed no error in admitting and considering such evidence absent an objection from Defendant. *State v. Albarado*, 6 S.W.3d 197, 203 (Mo.App. S.D.1999). Additionally, the trial court gave a limiting instruction to the jury as a precautionary measure to prevent the jury from using the testimony for its truth. We disagree that the anonymous female's statements prejudiced Defendant because the statements somehow provided the essential link between the robbery and Defendant. The essential link, in our mind, was Defendant's own confession and the Victim's detailed identification of Defendant, rather than any information provided by the anonymous caller.

Accordingly, we conclude that admission of the testimony in question, whether or not hearsay, was not outcome-determinative and was harmless beyond a reasonable doubt under the circumstances of this case. We find beyond a reasonable doubt that Defendant would have been convicted even if Victim and Officer Othman had been prevented from testifying about the anonymous female's statements. In order to justify relief, Defendant must show that the trial court committed evident, obvious and clear error that affected his substantial rights, and that such error was a manifest injustice or a miscarriage of justice. *Cohen*, 145 S.W.3d at 864. Here we find the Defendant proved neither. Defendant's point is denied.

### Conclusion

The judgment of the trial court is affirmed.

GLENN A. NORTON and PATRICIA L. COHEN, JJ., Concur.