# United States Court of Appeals
## For the First Circuit

No. 08-2307

UNITED STATES OF AMERICA,

Appellee,

v.

CAROL ARANJO,

Defendant, Appellant.

No. 08-2341

UNITED STATES OF AMERICA,

Appellee,

v.

ALPHONSO SMITH,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lynch, Chief Judge,

Boudin and Stahl, Circuit Judges.

Judith H. Mizner, Assistant Federal Public Defender, Federal Defender Office, for appellant Carol Aranjo.
Jane Elizabeth Lee, by appointment of the court, for appellant Alphonso Smith.

Daniel Steven Goodman, Criminal Division, Appellate Section, Department of Justice, with whom Lanny A. Breuer, Assistant Attorney General, Department of Justice, Gary G. Grindler, Deputy Assistant Attorney General, Department of Justice, Michael K. Loucks, Acting United States Attorney, and Karen L. Goodwin, Assistant United States Attorney, were on brief for appellee.

---

May 3, 2010

---

**BOUDIN**, <u>Circuit Judge</u>.  Carol Aranjo was chief executive officer, treasurer, and a director of the D. Edward Wells Federal Credit Union ("Wells"), a federally chartered financial institution in Springfield, Massachusetts.  Wells was regulated by the National Credit Union Administration ("NCUA"), an independent federal agency that regularly examines credit unions for compliance with regulatory requirements.

Between 1999 and 2002, two NCUA examiners discovered problems with Wells' books, including an unusually high and under-documented loan to a Wells-related entity, Friends of the Credit Union ("Friends"), the treasurer of which was Aranjo's husband Alphonso Smith.  Aranjo resisted the examiners' investigation, refusing to permit them to view the credit union's financial information such as members' loan and deposit data and the Friends loan documentation.

Partly because of the Friends loan, NCUA decided in late 2002 that it could no longer conclude that Wells was sound and, in February 2003, NCUA placed Wells in conservatorship in order to return it to solvency.  During conservatorship, NCUA discovered significant negative balances on several Wells accounts, including Aranjo's and her husband's personal accounts, which showed negative balances of $71,000 and $88,000, respectively, as well as large suspicious transfers among Wells accounts that made negative accounts appear positive.

NCUA was forced to liquidate Wells, and Aranjo and Smith were indicted and tried in federal district court on charges that included conspiracy to embezzle and to make false entries in a federal credit union's books, 18 U.S.C. § 371 (2006), embezzlement, id. § 657, bank fraud, id. § 1344, and filing false tax returns, 26 U.S.C. § 7206(1) (2006). Some of the counts were directed at Aranjo alone or Smith alone. Aranjo was additionally charged with making false entries, 18 U.S.C. § 1006, and obstructing the examination of a financial institution, id. § 1517.

A five-week trial ensued and the jury convicted both Aranjo and Smith of conspiracy to embezzle and to make false entries, as well as of four counts of embezzlement. Aranjo was also convicted of separate counts charging substantive offenses (embezzlement, filing false tax returns, bank fraud, fraudulent false entries, and obstructing the examination of a financial institution) and Smith of two other substantive offenses (four counts of filing false tax returns and one count of bank fraud). There were acquittals on a few other counts.

Aranjo was sentenced to 54 months in prison and Smith to 12 months and one day. Both were ordered to provide $400,000 in restitution to NCUA, with Aranjo to provide an additional $1 million to a credit union insurer. Both now appeal and each argues that the government's peremptory challenge of an African-American juror violated their rights under Batson v. Kentucky, 476 U.S. 79

-4-

(1986).  Smith makes several other claims, but we begin with the Batson challenge common to both appellants.

During jury selection, Aranjo's counsel (joined by Smith's counsel) objected to one of the prosecutor's peremptory challenges, noting that the prospective juror was "seemingly the one African American woman on the jury panel . . . which implicates both classes [race and gender]."  Aranjo's counsel pointed out that--contrary to the court's suggestion--a different, male juror probably was not African-American, and that there were very few women on the jury.

The court then asked the prosecutor to explain her challenge.  She replied that there were

> two reasons, both relating to [the juror's] employment with the Job Corps, which is a federally funded organization that has some government regulatory oversight.  It also serves a population of . . . juveniles who have been in trouble with the law, and treats them at a residential setting.  So I am concerned about her identification with individuals who have been charged with crime, as well there's going to be a lot of testimony here with respect to dealing with federal regulators and the federal government as part of the defense in this case.

After some back and forth, the prosecutor explained that, based on her prior experience with Job Corps cases, she knew that Job Corps employees are not strictly speaking federal employees or part of a federal agency but instead are "hire[d] . . . from the outside" by the Department of Labor, such that their relationship

-5-

with federal supervisors can be "contentious." Aranjo's counsel noted that the prosecutor had not struck a white male juror who had admitted a juvenile conviction,[1] and claimed that this showed the prosecutor's proffered reasons were in this respect a pretext for racial discrimination.

The court then allowed the government's peremptory challenge, accepting that the prosecutor acted on the race-neutral reason that the juror "is associated with an entity that is under the eye of the federal government and . . . would be unduly affected by that." After the court ruled, the prosecutor noted that there would be testimony about Aranjo's work with the Youth Credit Union, the mission of which included helping to "keep kids out of trouble."

The format in the trial court for framing and deciding a Batson challenge is as follows:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

---

[1]No juror had admitted a juvenile conviction, but one--whom defense counsel ultimately struck--had admitted to being "criminally charged with vandalism and work[ing] through that as a kid" 26 years earlier. Another had been accused and acquitted of arson at age 18.

Miller-El v. Cockrell, 537 U.S. 322, 328-29 (2003) (citations omitted). The defendant ultimately bears the burden of persuasion as to discriminatory purpose. Johnson v. California, 545 U.S. 162, 170-71 (2005). Where the trial judge has found that the burden has not been carried, review of a preserved Batson claim is for clear error. United States v. Girouard, 521 F.3d 110, 115 (1st Cir. 2008).

The parties dispute whether the defendants established a prima facie case of discrimination and whether the district court so found, but as the prosecutor offered an explanation and the judge accepted it, we do not pursue the issue. Some case law suggests that this sequence makes it unnecessary to decide the prima facie issue. Hernandez v. New York, 500 U.S. 352, 359 (1991); United States v. Perez, 35 F.3d 632, 635 (1st Cir. 1994). Certainly that is true where, as here, we uphold the trial judge's finding that the explanation was adequate.

Aranjo and Smith argue that the prosecutor's concern about the struck juror's Job Corps affiliation was pretextual, pointing to two sets of white jurors that they claim were "similarly situated" but were not struck: the two jurors who had reported being accused of crimes in their youth, see note 1 above, and two who had ties to the banking industry. True enough, "[i]n considering Batson claims, courts may examine . . . whether similarly situated jurors from outside the allegedly targeted group

were permitted to serve." <u>Aspen</u> v. <u>Bissonnette</u>, 480 F.3d 571, 577 (1st Cir. 2007).

But the connections between two jurors and the banking industry were more attenuated than the challenged juror's connection to the Job Corps: one had a father-in-law on a savings bank board and another had a daughter who worked for a bank; by contrast, the challenged juror in this case worked directly for the Job Corps. Several of the charges against Aranjo involved alleged obstruction of supervisory officials, so a concern about an antagonistic relationship between Job Corps employees and federal managers could be legitimate.

The prosecutor gave no specifics beyond a general reference to her own experience, but none were sought. Further, a <u>Batson</u> challenge is a preliminary matter handled by the judge with few formalities. Nor is the accuracy of the prosecutor's assessment critical; it is enough if her explanation was race-neutral and reflected her true motive. <u>Purkett</u> v. <u>Elem</u>, 514 U.S. 765, 768-69 (1995) (per curiam); <u>Mitleider</u> v. <u>Hall</u>, 391 F.3d 1039, 1049 (9th Cir. 2004); <u>United States</u> v. <u>Thomas</u>, 320 F.3d 315, 320 (2d Cir. 2003). Peremptory challenges are regularly based on counsel's prior experience with jurors.

As for the jurors criminally accused as youth, the accusations were decades earlier for both, while the prosecutor said she was concerned about a juror who did or had worked with an

organization that might identify with those charged with crime. Further, the struck juror was the only one who fit both of the prosecutor's negative concerns: possible identification with those criminally accused and potential antagonism toward federal regulators. In all, the district judge did not clearly err in accepting the proffered reasons.

Smith alone makes a number of other claims of error. We begin with Smith's claim that the evidence against him was insufficient. With some basis, the government treats this as a challenge only to Smith's conviction for conspiracy and not to the substantive counts on which he was convicted; but Smith's brief is imprecise and certain of his arguments, if successful, might logically undermine his aiding and abetting convictions on the four embezzlement counts.[2] In any event, the facts that support them are building blocks for the conspiracy count.

An attack on the sufficiency of the evidence is normally an uphill struggle: although the jury must find the elements of the offense beyond a reasonable doubt, the defendant's burden on appeal is to show that, crediting the government's witnesses and drawing all reasonable inferences in its favor, no reasonable jury could

---

[2]Smith's motion for judgment of acquittal appears to have aimed at all of these counts, but Smith's brief on appeal focuses on the conspiracy. Nothing in his brief disputes the evidence for his conviction on four counts of filing false tax returns and on one count of bank fraud. The tax counts were for failing to report the income that the government claimed he had embezzled; the bank fraud concerned unrelated matters.

have reached a guilty verdict. United States v. Marin, 523 F.3d 24, 27 (1st Cir. 2008). In this case the four substantive embezzlement convictions are secure and their evidence bears on the conspiracy charge as well.

Each count rested on one or more transactions through which Smith or an entity he controlled improperly received money from Wells. Three concerned Smith's expenditure of funds in excess of amounts on deposit in his personal account or the account of one of his companies.[3] The fourth concerned a $225,000 transfer into one of the company accounts, which constituted an undocumented "loan" from Wells against which only one $10 payment was ever made (as to this, an IRS agent with a corporate accounting background offered testimony that it was "not a true loan").

Proof of these transactions and their impropriety was coupled with evidence that Smith was regularly receiving cashier's checks or making withdrawals unsupported by funds in his personal account or others he controlled; that his wife was involved in giving approval for such transactions; that some payments occurred immediately after he had conferred with her at the bank; and that the negative balances were sufficiently large that he had to know that his withdrawals were misappropriating bank funds, particularly

---

[3]For example, Smith used money from his negative balance Wells account to pay for a sauna for his and Aranjo's home and wrote checks for hundreds of thousands of dollars from the negative balance D.A.T. Construction account, some made out to himself.

-10-

since he received and possessed information revealing those negative balances.

Smith's theory is that at worst he was merely the recipient of funds embezzled by his wife and not himself an embezzler or a co-conspirator. One can be a knowing recipient of stolen goods without necessarily being an aider and abettor of the theft or a co-conspirator, see, e.g., Baker v. United States, 393 F.2d 604, 609 (9th Cir. 1968); but these four counts do not charge wrongful transfers to or withdrawals by Aranjo subsequently passed on to Smith; in each instance he or his company obtained money from Wells with Aranjo's cooperation, directly aiding and abetting an embezzling transaction that she facilitated.

Each of these transactions is also evidence of a conspiracy to embezzle. Perhaps a jury could view them as separate conspiracies; but their number, the common use of Wells' funds and Aranjo's authority, the benefit that each defendant might receive from the funds the other obtained from Wells, and the similarity in methods permitted the jury to infer an arrangement between them to fleece Wells for their mutual benefit. United States v. Rivera Calderon, 578 F.3d 78, 89-91 (1st Cir. 2009); United States v. Soto-Beniquez, 356 F.3d 1, 18-19 (1st Cir. 2004).

If the government's case is thin at all, it is solely insofar as the government charged that the objects of the conspiracy were both "to fraudulently obtain and convert to their

-11-

own personal use and to the personal use of others, money from Wells" and "to prevent detection of the fraud." While the former was amply proved as to both defendants, little <u>direct</u> proof exists of Smith's involvement with or even his direct knowledge of Aranjo's falsifications and obstructions. But the primary purpose--to embezzle--is all that is needed to convict.

Probably the government charged the secondary objective in order to ensure that the rich evidence of Aranjo's falsification and obstruction reached the jury; but the evidence was admissible against Aranjo even in a joint trial and even if preventing detection were not charged as an objective of the conspiracy. It may even be arguable--we need not decide the point--that the jury could reasonably infer that Aranjo and Smith discussed Aranjo's false book or record entries or that Smith had to know that they would occur as part of the embezzlement.

Yet even if we assume that evidence was lacking as to a common purpose to falsify books and obstruct detection, a conspiracy based on a common purpose to embezzle was both charged and proved. As a matter of common sense, the conspiracy conviction had to rest on the evidence of this common purpose to embezzle--which we have noted is ample--and not instead simply on a secondary purpose as to which very little was proved against Smith. <u>See</u> <u>Griffin</u> v. <u>United States</u>, 502 U.S. 46, 56-57 (1991); <u>United States</u> v. <u>Lanoue</u>, 71 F.3d 966, 982-83 (1st Cir. 1995).

Thus, the most Smith might have obtained--assuming that the secondary purpose had been originally omitted from the conspiracy charge against Smith or struck by the judge at the close of the government's case--was an instruction not to consider against him evidence of false entries and obstructive acts by Aranjo that scarcely inculpated him at all. No such instruction was sought and, given the thinness of the latter evidence as to Smith, the lack of such an instruction could scarcely have prejudiced Smith on the conspiracy charge or on any other.

Smith's remaining arguments all concern a statement in a report that was made by a NCUA examiner--Michelle Thibault--who was assigned to examine Wells in 1999; the report documented discussions that occurred at a NCUA-Wells joint conference. At issue is a single sentence in the report that reads, "[Aranjo] also stated [at the joint conference] that she spoke with her husband last night and that if the credit union does not sue NCUA, she may pursue legal action on her own," which Thibault also read aloud in her testimony at trial.

The context was efforts by Aranjo to halt or limit NCUA's endeavors, and the government mentioned Aranjo's statement to the jury in closing as one indication that Smith had knowledge of and therefore conspired in efforts his wife was making to conceal the embezzlements. The statement is weak proof either that Smith knew his wife was aiming to conceal wrongdoing or that he joined in that

purpose; it does little more than say she might sue NCUA, confirming that he and his wife talked about Wells and the investigation.

But this, of course, is something that the jury could reasonably infer from other evidence. A number of the diversions of Wells' assets involved both of the defendants, and some of the funds were spent for purchases from which they both benefitted. And, as part of the investigation concerned entities in which Smith was involved--Friends of the Credit Union, of which he was treasurer, and D.A.T. Destiny and D.A.T. Construction, two companies he controlled--he could not reasonably have been ignorant of it.

In all events, when the government asked Thibault about the sentence on direct examination, Smith objected without giving any reason; the judge overruled the objection while offering counsel the opportunity for a side bar conference if he wanted further argument, but counsel did not take up the invitation.[4] Smith now says that the admission of the statement was improper hearsay that violated his Confrontation Clause rights under Crawford v. Washington, 541 U.S. 36 (2004), and Bruton v. United States, 391 U.S. 123 (1968).

---

[4]Seemingly the jury's attention had already been drawn to the statement without objection during preliminary questions to Thibault, and the report itself was admitted into evidence without objection and was therefore available to the jury in any event.

-14-

As to hearsay, Smith concedes that the report was admissible as a business record, Fed. R. Evid. 803(6), but, as the reported statement was made by Aranjo and yet used as well against Smith, Smith complains that there was no finding by the judge that the statement within the report was admissible against Smith as one made by a co-conspirator during the conspiracy and in furtherance of it. United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). But Smith never requested such a finding, either upon his objection or at the close of all evidence, nor did he complain of its absence in moving for judgment of acquittal.

Although we could remand for a finding if we thought it necessary, United States v. Machor, 879 F.2d 945, 950-51 (1st Cir. 1989), the evidence of a conspiracy to embezzle by Aranjo and Smith was very strong; the statement added little, save as it allowed the government to suggest that Smith was aware of one specific step in the cover-up. Indeed, as already explained, evidence of the cover-up is almost beside the point as to Smith, while the adequacy of the evidence against Aranjo is not even challenged on appeal. Anyway the objection has been forfeited.

As for Smith's claim that the statement's admission violated the Confrontation Clause as interpreted by Crawford and Bruton, neither the concept nor either case was mentioned in opposing the admission of the statement. Thus, we review this claim only for plain error. United States v. Ziskind, 491 F.3d 10,

-15-

13-14 (1st Cir. 2007).  Given the powerful evidence of a conspiracy to embezzle, and the fact that the statement added almost nothing beyond what a jury would infer, we think the supposed constitutional error--if there was any--could not have changed the outcome, let alone caused a miscarriage of justice.[5]

Affirmed.

---

[5]See United States v. Olano, 507 U.S. 725, 734-36 (1993); United States v. Cotton, 535 U.S. 625, 632 (2002); Ziskind, 491 F.3d at 14.