# United States Court of Appeals
## For the First Circuit

---

No. 09-2517

UNITED STATES OF AMERICA,

Appellee,

v.

STIVEN F. POLANCO,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Selya and Thompson, Circuit Judges.

---

Jeffrey B. Ruben, with whom Todd C. Pomerleau and Sarah Unger were on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Peter F. Neronha, United States Attorney, Sandra R. Hebert and Milind M. Shah, Assistant United States Attorneys, were on brief, for appellee.

---

February 9, 2011

---

**THOMPSON, <u>Circuit Judge</u>.** A federal grand jury indicted Stiven Polanco on heroin-trafficking and firearm charges. After the district judge denied Polanco's motion to suppress a cache of incriminating evidence found in his car and apartment, a jury convicted him on all counts. His appeal presents three questions: Were the searches legal? Was a DEA agent's testimony about how much heroin an addict could use in a day admissible?[1] And was the evidence underpinning his conviction for aiding and abetting the distribution of heroin sufficient? We answer "yes" to these questions and affirm Polanco's conviction.

BACKGROUND

**<u>Facts</u>**

Consistent with the standard protocol, we summarize the key facts in the light most compatible with the verdict. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Troy</u>, 618 F.3d 27, 29 (1st Cir. 2010).

In the fall of 2008, a joint task force comprising federal and local law enforcement agents zeroed in on a suspected drug dealer, David Contreras. Posing as a lobsterman from Newport, task force member Seth Godek bought heroin from Contreras four times over a two-month stretch from October through November 2008. Each deal took place at the Providence Place Mall, an upscale shopping center in downtown Providence. December was shaping up to be more of the same. During a recorded phone call on December 2,

---

[1] DEA is the acronym for Drug Enforcement Administration.

-2-

2008, Contreras agreed to sell Godek 20 grams of heroin for $1,500. Speaking in code, they said they would do the deal at the Mall on December 3.  Phone records show that Contreras and Polanco called each other a total of six times later that day.  That was not unusual.  Records show they called each other nine times on the day of the December 3 deal, for example.

With Polanco at his side, Contreras came to the Mall as promised.  They sat in the food court and waited for Godek.  When Godek got there, Contreras told Polanco that he and Godek had to go to a nearby restroom – an area Contreras knew had no Mall security cameras.  Once there, Contreras swapped the heroin for the cash. Polanco and Godek then traded nods as Godek walked on by. Contreras headed back to where Polanco was sitting, counting the money.  A surveillance camera caught Contreras and Polanco huddled around a table.  They ate lunch and then left the Mall in Polanco's red Toyota Camry.

Contreras and Godek talked again on December 9.  Godek asked for 100 grams of heroin.  He said he would pay $6,500. Contreras said okay, and they agreed to rendezvous at the Mall's food court on December 10.  Within minutes of hanging up with Godek, Contreras called Polanco.  Records show a total of six calls between the two on December 9.  Records also show that Contreras called Polanco early on December 10, right after he had gotten off the phone with Godek.

Agents wanted to arrest Contreras and anyone else tied to the heroin scheme. Contreras and Polanco showed up at the food court on December 10 right on cue. But agents were concerned that arresting the two in a crowded Mall might endanger others, so they changed plans on the fly. Godek called Contreras and convinced him to do the deal at a parking lot in Warwick, Rhode Island. Polanco and Contreras drove to the new locale. Contreras was not happy. "I have the stuff," he told Godek during one of their many calls. "You better come get it." Contreras said he was in a red Camry, parked with the lights on.

And so he was, sitting in the passenger seat beside driver Polanco. Agents arrived on the scene and arrested the two on the spot. They found no heroin on either man. Heavy rains came, so agents drove Polanco's Camry to a DEA office. A warrantless search of the car there revealed a hidden compartment inside an armrest that contained 94.1 grams of heroin (just shy of the agreed-on amount) and a loaded handgun. To open the compartment, one had to use an electric motor to release a tension strap so that the armrest would lift up. Needless to say, contraptions like this do not come standard with Camrys.

Polanco told agents that he lived in a basement apartment at 422 Plainfield Street in Providence. His parents owned the building and lived upstairs. Agents then secured a warrant for Polanco's quarters and used the keys he had given them to get in.

They hit pay dirt: hidden above the ceiling tiles agents found 12.7 grams of heroin, plastic baggies (perfect for packaging heroin), a digital scale with heroin residue, two coffee grinders (perfect for grinding heroin), eleven rounds of ammunition, and $140 in marked bills that had passed from Godek to Contreras during the December 3 deal (they also came across $860 in unmarked currency).

**Proceedings**

In short order, a grand jury returned a four-count indictment charging Polanco with conspiring with Contreras to possess and distribute 100 grams or more of heroin (count 1), aiding and abetting Contreras in the December 3 heroin-distribution scheme (count 2), possessing with intent to distribute 100 grams or more of heroin on December 10 (count 3), and possessing a firearm in furtherance of drug-trafficking crimes (count 4). See 21 U.S.C. §§ 841(a)(1), (b)(1)(B), (b)(1)(C), 846 and 18 U.S.C. §§ 2, 924(c)(1)(A). Pleading not guilty, Polanco filed a motion to suppress. Calling the warrantless search of his car unconstitutional, Polanco argued that had the agents not illegally rummaged through his auto, they would not have had enough probable cause to get a search warrant for his apartment. So he asked the district judge to suppress everything seized. After an evidentiary hearing, the judge found the car search constitutionally permissible under the auto exception to the Fourth Amendment's

-5-

warrant requirement, see United States v. Dickerson, 514 F.3d 60, 66 (1st Cir. 2008) (permitting "a warrantless search of a car if there is probable cause to believe" that it has "contraband or evidence of a crime") – which ruined Polanco's fruit-of-the-poisonous-tree argument concerning the apartment search.

The trial lasted two days. A parade of agents discussed the ins and outs of what had happened. One also discussed how many bags of heroin most addicts purchase for personal use. At the end of the prosecution's case, Polanco moved for a judgment of acquittal, which the judge denied. Polanco opted not to present any evidence on his own behalf, and the jury found him guilty of all charges. The judge later sentenced him to 120 months, comprising concurrent sentences of 60 months each on counts 1-3 and a consecutive 60-month sentence on count 4. This appeal followed.

We will disclose additional details as we discuss specific issues.

**ANALYSIS**

**Legal Searches**

Polanco insists that the district judge stumbled in denying his suppression motion. We review the judge's ruling de novo, except that we assess his factual findings (which Polanco does not really contest) only for clear error and will affirm his ruling if "'any reasonable view of the evidence supports it.'"

United States v. Bater, 594 F.3d 51, 55 (1st Cir. 2010) (quoting United States v. Mendez-de Jesus, 85 F.3d 1, 2 (1st Cir. 1996)).

Polanco protests that the judge failed to see that Arizona v. Gant, 129 S. Ct. 1710 (2009), signals a rollback of the auto exception. Gant, he says, limits warrantless vehicle searches to situations where an arrestee is unsecured and close enough to threaten officer safety or destroy evidence. And, his argument continues, agents had him in a cell when they combed the car for evidence at a secure location, so the search offended the Fourth Amendment.

This is a dead-end argument. Gant dealt with the search-incident-to-arrest doctrine in the vehicle context. Pre-Gant, officers could conduct a warrantless search of "the passenger compartment of [the arrestee's] automobile" under that doctrine. New York v. Belton, 453 U.S. 454, 460 (1981). Some courts even permitted searches "when . . . the handcuffed arrestee ha[d] already left the scene." Thornton v. United States, 541 U.S. 615, 628 (2004) (Scalia, J., concurring in the judgment) (collecting cases reading Belton broadly). But Gant clarified that an automobile search may fall within the search-incident-to-arrest doctrine only in two very specific situations: "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" (the officer-safety justification), or "when it is 'reasonable to believe evidence

relevant to the crime of arrest might be found in the vehicle'" (the evidence-preservation justification).  Gant, 129 S. Ct. at 1719 (quoting Thornton, 541 U.S. at 632 (Scalia, J., concurring in the judgment)).  Gant also noted that officers may conduct vehicle searches under other doctrines.  Id. at 1721.

Our case does not involve the search-incident-to-arrest exception, however.  As the district judge noted, the government had jettisoned any search-incident-to-arrest theory before the suppression hearing.  Only the auto exception matters here – an exception that provides that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity," agents can search without a warrant "any area of the vehicle in which the evidence may be found."  Id. (discussing United States v. Ross, 456 U.S. 798, 820-21 (1982)).  And, critically, Gant did not scrap that exception.  See id.  That is not just our opinion:  every circuit that has considered the issue to date has either concluded or assumed that the auto exception survived under Gant.  See, e.g., United States v. Arriaza, No. 09-4957, 2010 WL 4813775, at *2 (4th Cir. Nov. 24, 2010) (unpublished); United States v. Aquilera, 625 F.3d 482, 485-86 (8th Cir. 2010); United States v. Hinojosa, No. 09-10969, 2010 WL 3257768, at *1 (5th Cir. Aug. 16, 2010) (unpublished); United States v. Vinton, 594 F.3d 14, 25 (D.C. Cir. 2010); United States v. Stotler, 591 F.3d 935, 940 (7th Cir. 2010). We assumed as much in United States v. Bucci, 582 F.3d 108, 117

(1st Cir. 2009). Now that the issue is directly before us we turn that assumption into a holding.

Before we go further, we add a few words of caution. The auto exception is distinct from the evidence-preservation component of Gant's search-incident-to-arrest analysis (which for simplicity's sake we call the Gant evidentiary justification). We give two examples only. The auto exception extends beyond the crime of arrest. See Gant, 129 S. Ct. at 1721. But the Gant evidentiary justification does not extend to evidence of other offenses. See id. Also, the auto exception requires probable cause. See id. But the Gant evidentiary justification only requires a "reasonable basis." See id. at 1719. These distinctions make a difference. And, for obvious reasons, it is important to keep them straight.

Now back to Polanco. Measured against the auto exception's regime, Polanco's challenge comes up short. Consider what agents knew before the December 10 car search. The December 3 heroin deal had gone down at the Mall's food court and involved Contreras, Polanco, and Polanco's Camry, and the December 10 deal was set to play out the same way until agents changed locations out of concern for the public's safety. Agents then saw Contreras leave the Mall with Polanco in Polanco's car, and Contreras told Godek over the phone to come "get this stuff." When agents got to the new site they spied Polanco and Contreras waiting in Polanco's

car. A pat-down search of the two turned up nothing. But a Mirandized Contreras told all. Polanco's car had a "trap" (a street term for a hidden compartment), a nervous Contreras whispered to agents at the scene, and the heroin and a loaded gun were stashed inside, he said. He also fingered Polanco as his supplier.[2] Given these facts, we think agents had more than enough probable cause to believe that Polanco's car contained evidence of criminality. See generally United States v. Woodbury, 511 F.3d 93, 97-98 (1st Cir. 2007) (emphasizing that probable cause only requires a fair probability – which is well short of certainty – that evidence of criminal activity will be found in a particular place).

As a fallback defense, Polanco contends that the search flunked the auto-exception test, for three reasons: agents did not actually stop his car, they gave it a thorough going over at another locale, and they had time to get a warrant. But each argument is a retread that has no traction: an impressive convoy of auto-exception cases holds that if the requisite probable cause exists it matters not whether the vehicle was already parked, see, e.g., United States v. McCoy, 977 F.2d 706, 710 (1st Cir. 1992); United States v. Panitz, 907 F.2d 1267, 1271 (1st Cir. 1990), whether it was searched at another locale, see, e.g., Ross, 456

---

[2] Testimony about Contreras's confession – which the judge found entirely credible – was admitted only at the suppression hearing.

U.S. at 807 n.9; United States v. Lopez, 380 F.3d 538, 545 (1st Cir. 2004); McCoy, 977 F.2d at 710, or even whether agents had time to obtain a warrant first, see, e.g., Ross, 456 U.S. at 807 n.9; Panitz, 907 F.2d at 1270 n.3.

The end result, then, is this. Because probable cause existed, the search of Polanco's Camry was lawful under the auto exception – a conclusion that spoils his fruit-of-the-poisonous-tree claim regarding the apartment search. Consequently, the district judge rightly denied Polanco's motion to suppress.

**Admissible Testimony**

Possession-with-intent-to-distribute cases require prosecutors to prove that a defendant possessed the drugs for distribution rather than for personal use. See, e.g., United States v. Maher, 454 F.3d 13, 23 (1st Cir. 2006); United States v. Reynoso, 336 F.3d 46, 49 (1st Cir. 2003); United States v. Valle, 72 F.3d 210, 214 (1st Cir. 1995). To help prove that here, prosecutors turned to task force member Michael Naylor. After discussing his long experience in drug enforcement and his intimate familiarity with the heroin world, Naylor testified without objection that a single gram of heroin yields 50 doses – thus the heroin seized from Polanco's Camry alone was enough for almost 5,000 doses. To cement the prosecution's distribution position and undercut any claim of personal use, Naylor testified that a typical heroin addict may do 3-5 doses a day. A heavy user may do 10-20

-11-

doses a day.  Anything above that could kill a person.  Actually, Naylor added, he knew two people who died after doing 50 doses.

Polanco spends a lot of time trying to convince us that Naylor's 50-doses-may-kill-you comment was irrelevant and unduly prejudicial.  See Fed. R. Evid. 401, 403.  If properly preserved, these issues trigger abuse-of-discretion review, see, e.g., United States v. Gonzalez-Melendez, 594 F.3d 28, 34 (1st Cir. 2010); United States v. Griffin, 818 F.2d 97, 101-02 (1st Cir. 1987) – if unpreserved, plain-error review takes over, see, e.g., United States v. Nelson-Rodriguez, 319 F.3d 12, 34 (1st Cir. 2003).  The government wonders whether Polanco did enough to preserve either issue.  We need not wrestle with that question, however.  Even giving Polanco the benefit of the doubt on the preservation point, we find no fault with the judge's discretionary calls.

Relevant evidence, Rule 401 says, is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Clearly, whether Polanco had the heroin for distribution or personal use was a matter of consequence at trial.  See, e.g., Maher, 454 F.3d at 23; Reynoso, 336 F.3d at 49; Valle, 72 F.3d at 214.  And the range of daily doses that Naylor said an average heroin addict could use – from light to heavy to death-inducing – helped prove a pivotal point:  that the huge amounts of heroin involved here were

consistent with distribution as opposed to personal use. <u>Cf.</u>, <u>e.g.</u>, <u>Maher</u>, 454 F.3d at 23; <u>Reynoso</u>, 336 F.3d at 49; <u>Valle</u>, 72 F.3d at 214. The long and short of it is that Naylor's testimony easily satisfied the not-too-hard-to-meet relevancy standard.

Polanco fares no better on his undue-prejudice claim. For the reasons just given, Naylor's testimony was plainly probative on the distributive-intent issue. No doubt, the testimony was prejudicial, in the sense that it showed that the amounts of heroin were too large to represent personal use. But it was not <u>unfairly</u> so, particularly since Naylor never intimated a possible suggestion that Polanco had supplied heavy heroin users or had caused overdoses or deaths. Rarely will we override a judge's balancing of relevance and prejudice, <u>see</u>, <u>e.g.</u>, <u>United States</u> v. <u>Winchenbach</u>, 197 F.3d 548, 559 (1st Cir. 1999), and we see no reason to second-guess the judge's discretionary judgment here.

### Sufficient Evidence

Last we come to Polanco's claim that the evidence did not support his aiding-and-abetting conviction – a conviction that required proof that he had knowingly helped Contreras commit the December 3 heroin crime, wanting it to succeed. <u>See</u> <u>United States</u> v. <u>Urciuoli</u>, 513 F.3d 290, 299 (1st Cir. 2008) (noting Judge Learned Hand's "classic" definition that an aider and abetter is one who "'associate[s] himself with the venture, . . . participate[s] in it as in something that he wishes to bring

-13-

about,'" and "'seek[s] by his action to make it succeed'") (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir. 1938)); see also United States v. Lugo Guerrero, 524 F.3d 5, 13 (1st Cir. 2008). Polanco's theory is simple. He says that the evidence proved only his presence when Contreras sold the heroin, not his knowing and intentional participation. But a sufficiency challenge is a tough sell. See, e.g., United States v. Aranjo, 603 F.3d 112, 116 (1st Cir. 2010); United States v. Ortiz, 447 F.3d 28, 32 (1st Cir. 2006). Polanco must show that, viewing the evidence and reasonable inferences in the light most favorable to the prosecution, no rational jury could have convicted him. See, e.g., Aranjo, 603 F.3d at 116; United States v. Baltas, 236 F.3d 27, 35 (1st Cir. 2001). And as part of our de novo inquiry, we cannot re-weigh the evidence or second-guess the jury's credibility decisions either. See, e.g., United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992). Polanco's sufficiency challenge misses the mark by a country mile.

As Polanco says, it is not a crime to pal around with criminals or to be there when they break the law. Id. at 712. But this was more than a palling-around or mere-presence case. Eyeing the record from the prosecution's perspective (as we are required to do at this stage), we recap what a rational jury could have found:

**1.** Polanco and Contreras called each other six times just after Godek had set up the December 3 deal and nine times on the day of the deal.

**2.** Polanco drove Contreras to the Mall in his red Camry on December 3.

**3.** Polanco remained close by when Contreras headed to the bathroom to do the heroin-cash exchange with Godek.

**4.** After the transaction, Contreras counted the cash as he walked back to Polanco, and the two did something together while hunched over a table. Also, Polanco and Godek traded nods as Godek left the food-court area.

Polanco insists that he had a "legitimate purpose" for being at the Mall (eating lunch) and that there is nothing sinister about two people exchanging nods (simply a "socially ingrained autoresponse," he says). But again, we must assume that the jury credited the prosecution's evidence and drew inferences in its favor – not Polanco's. See, e.g., United States v. Rodriguez-Vélez, 597 F.3d 32, 38-39 (1st Cir. 2010). That his acts may not look "illegal when viewed in isolation does not bar his conviction" either – and the prosecution's "proof at trial 'need not exclude every reasonable hypothesis of innocence, provided the record as a whole supports a conclusion of guilt beyond a reasonable doubt.'" Ortiz, 966 F.2d at 714 (quoting United States v. Victoria-Peguero,

920 F.2d 77, 86-87 (1st Cir. 1990)).  Consequently, Polanco's innocence hypotheses cannot win the day for him.

5.  Polanco then drove Contreras from the Mall in his red Camry.

6.  Also devastating to Polanco's position, among the cash seized from his apartment were marked bills from the December 3 drug buy, indicating that he had profited from that deal. Looking to deflect the impact of all this, Polanco contends that the jury could not consider evidence collected or events that occurred after the December 3 deal, no matter how much light these shed on his role in that crime.  At oral argument, his counsel candidly conceded that he had no authority for that claim.  We are not surprised, given that our cases hold that evidence of events that occur after the crime's commission can shine a spotlight on a defendant's guilt or innocence.  See, e.g., United States v. Lara, 181 F.3d 183, 204 (1st Cir. 1999) (collecting cases).  Not surprisingly, then, his claim goes nowhere.

7.  Finally, an experienced task force member testified that dealers seldom bring innocents to drug deals, which strengthens an already-strong inference that Polanco knowingly took part in the December 3 heroin-cash exchange.  See Ortiz, 966 F.2d at 712 (commenting in an aiding-and-abetting case that "[j]urors can be assumed to know that criminals rarely welcome innocent

-16-

persons as witnesses to serious crimes and rarely seek to perpetrate felonies before larger-than-necessary audiences").

Given this factual composite (sketched in the light most flattering to the prosecution), a reasonable jury could have easily concluded that Polanco was not innocently hanging out with Contreras during the December 3 deal but rather was knowingly participating in a crime that he doubtless wanted to succeed. Stated slightly differently and in sum, the evidence allowed a levelheaded jury to convict Polanco on the aiding-and-abetting count, so his sufficiency challenge fails.

## CONCLUSION

Detecting no trace of reversible error, we **<u>affirm</u>** the judgment of conviction in all respects.

**<u>So Ordered</u>**.