[Cite as *State v. Pinckney*, 2015-Ohio-3899.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellant, | : | No. 14AP-709 |
| | | (C.P.C. No. 13CR-5741) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Jason Pinckney, | : | |
| Defendant-Appellee. | : | |

---

D E C I S I O N

Rendered on September 24, 2015

---

*Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellant.

*Sydow Leis LLC*, *Anastasia Sydow*, and *Aaron Laflin*, for appellee.

---

APPEAL from the Franklin County Court of Common Pleas.

BROWN, P.J.

{¶ 1} This is an appeal by plaintiff-appellant, State of Ohio, from a judgment of the Franklin County Court of Common Pleas granting a motion to suppress filed by defendant-appellee, Jason Pinckney.

{¶ 2} On October 29, 2013, appellee was indicted on one count of improperly handling firearms in a motor vehicle, in violation of R.C. 2923.16. On August 17, 2014, he filed a motion to suppress evidence. On August 27, 2014, the state filed a memorandum contra the motion to suppress.

{¶ 3} On September 4, 2014, the trial court conducted a hearing on the motion to suppress. The state presented the testimony of one witness, Columbus Police Officer John Hawkins, who has been a member of the police force for approximately four years.

On October 20, 2013, "[s]hortly after midnight," Officer Hawkins and several other officers responded to a dispatch regarding shots fired near Carstare Court, Columbus. (Tr. 5.) A caller had reported hearing "multiple shots." (Tr. 6.) Officer Hawkins was "[v]ery" familiar with the location, and had previously responded to calls in that area involving robberies, felonious assaults, and homicides; he had also previously responded "[m]ultiple times" to reports involving weapons and shots fired. (Tr. 8.)

{¶ 4} Officer Hawkins and his partner "parked north of the location on Carlton [Avenue]" and approached "on foot going southbound." (Tr. 6.) Officer William Pernell parked his cruiser near the intersection of "Elaine [Road] and Carstare and approached westbound on foot; and Officer [Brian] Casteel parked further west also on Carlton and approached southbound on foot." (Tr. 6.)

{¶ 5} As Officer Hawkins and his partner approached, they "heard one additional gunshot," and as the officers "got closer to the area [they] heard approximately six more shots being fired." (Tr. 6.) The officers "aired for additional units to respond." (Tr. 6.) Officer Hawkins related that the shots were approximately "200 feet, very close, to the point where there wasn't even an echo. We could tell almost exactly where they were coming from." (Tr. 6.) The shots "sounded as if they were coming from the rear of Carstare Court." (Tr. 11.) Officer Hawkins testified that, upon hearing the shots, he was concerned for "[m]y safety, the safety of those around us." (Tr. 19.)

{¶ 6} Officer Hawkins and his partner "approached on Carstare Court to the back parking lot" through the south entrance. (Tr. 6-7.) They "circled around the front of the [apartment] building * * * expecting a vehicle to leave." (Tr. 11.) The officers had a clear view of the ingress and egress points; Officer Hawkins described the area as "one-way in/one-way out." (Tr. 7.) As the officers came around a corner, near the vicinity of the shots, they observed a vehicle and then heard the "car start" and "saw headlights come on in the rear parking lot." (Tr. 12.) It was difficult to see inside the vehicle because the windows "were fogged up" and there was "dew on the windows." (Tr. 12.) The officers did not observe any other vehicles entering or leaving that area, nor did they observe any individuals on foot. According to Officer Hawkins, the individual in the vehicle was "the only person in that parking lot." (Tr. 12.)

{¶ 7} Officer Hawkins and his partner approached with "firearms pointed at the driver of the vehicle. We were giving loud verbal commands to put the vehicle in park,

turn off the vehicle."  (Tr. 13.)   The car "was slowly inching forward, going pretty much straight westbound, starting to turn."  (Tr. 13.)   The driver "was not complying with any of the verbal commands.   The window was rolled down four to six inches."  (Tr. 13.)   The officers told the driver "over and over again [to] turn off the car, put it in park, put your hands out the window."  (Tr. 14.)   The driver "eventually put the car in park and turned it off."  (Tr. 14.)

{¶ 8}   Appellee exited the vehicle "[v]ery quickly.   He jumped out of the car."  (Tr. 16.)   Appellee appeared to be "[v]ery nervous" and "was shaking."  (Tr. 17.)   He "looked back at the vehicle multiple times as he exited it."  (Tr. 17.)   Appellee told the officers that "he saw two male blacks running northbound and they were the ones that did the shooting."   (Tr. 15.)   The direction from which appellee said he observed the two individuals running was the same area the officers had just traveled on foot.  Appellee also told the officers: "There is no gun in the car."  (Tr. 17.)   Officer Hawkins testified that the officers had not asked appellee about a weapon at that time.

{¶ 9}   Appellee "was not handcuffed at that point."  (Tr. 16.)   The officers "patted him down for weapons" in order to "make sure there wasn't a firearm on his person."  (Tr. 16.)   The officers found no weapons on appellee.   Officer Hawkins then "maintained physical control" of appellee at the rear of his vehicle while Officer Nick Clark "conducted a sweep of the vehicle."  (Tr. 17-18.)   Officer Clark found a loaded "Jennings J-22 firearm" in the glove box of the vehicle.  (Tr. 18.)   Upon discovering the weapon, the officers placed appellee under arrest.

{¶ 10} On cross-examination, Officer Hawkins testified that appellee, upon exiting the vehicle, was "under our physical control."  (Tr. 25.)   During re-direct examination, the officer stated that appellee "was not in reach of the vehicle" during the time Officer Clark conducted the search of the vehicle.  (Tr. 28.)   According to Officer Hawkins, in order for appellee to reach the glove compartment, he "would have had to have gotten away from me and gone through my partner."  (Tr. 31.)   When questioned by the trial court as to why the officers searched the vehicle, Officer Hawkins responded: "To make sure there was no firearm in the vehicle.   He was about to be released, if there wasn't.   We were going to be putting him back inside that vehicle.   We wanted to make sure there was nothing in that vehicle that was going to hurt us when we did so."  (Tr. 32.)

{¶ 11} At the close of the testimony, the trial court indicated on the record that it would grant the motion to suppress, stating in part as follows:

> So there was testimony that [appellee's] car was the only one in the parking lot where it appeared that the gunshots were being fired from and that an officer came from the direction where [appellee] said the two people ran. So I do think that the stop was reasonable.
>
> * * *
>
> In this case, * * * even under the cop's testimony [appellee] was not under arrest; and when asked specifically by the court, Officer Hawkins testified that [appellee] would have had to get away from him and then go through another police officer to get to the glove box where the gun was ultimately found. So the plain view doctrine does not apply. It doesn't appear that there were exigent circumstances, if [appellee] had to go through two people to get to the glove box. There is no testimony about hot pursuit or stop and fris[k]. There is no testimony about any type of consent, the waiving of constitutional rights; and since [appellee] was not under arrest, there was no search incident to a lawful arrest.

(Tr. 41-42.)

{¶ 12} The trial court also discussed the holding in *Michigan v. Long,* 463 U.S. 1032 (1983), stating in part:

> * * * Michigan v. Long * * * says the police may search those areas of the passenger compartment under the immediate control of the occupants of a car where the occupants could presumably reach for a weapon.
>
> And again, Officer Hawkins testified that in order for [appellee] to get to the glove box, he would have had to get away from Officer Hawkins and pass another cop in order to get to the glove box. So for those reasons, I'm going to grant the motion to suppress.

(Tr. 43.)

{¶ 13} By decision and entry filed September 5, 2014, the trial court granted appellee's motion to suppress "for the reasons stated on the record."

{¶ 14} On appeal, the state sets forth the following two assignments of error for this court's review:

[I.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT INVALIDATED A SEARCH PROPERLY CONDUCTED UNDER THE PROTECTIVE-SEARCH DOCTRINE OF *MICHIGAN V. LONG.*

[II.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WHEN IT FAILED TO ADDRESS OR APPLY THE GOOD-FAITH EXCEPTION TO THE FEDERAL EXCLUSIONARY RULE.

{¶ 15} Under the first assignment of error, the state argues that the trial court erred in granting appellee's motion to suppress, asserting the court failed to properly apply the United States Supreme Court's holding in *Long* to the facts of this case. The state cites findings by the trial court that the search of the passenger compartment could not be justified because appellee was under the officers' control and did not have immediate access to the passenger compartment of the vehicle at the time of the search. The state argues that the trial court erroneously relied on the search incident to arrest exception under *Arizona v. Gant,* 556 U.S. 332 (2009), rather than the protective search exception under *Long.*

{¶ 16} This court's review of a trial court's ruling on a motion to suppress "presents a mixed question of law and fact." *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. In considering a motion to suppress, "the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses." *Id.* An appellate court must therefore "accept the trial court's findings of fact if they are supported by competent, credible evidence." Further, "[a]ccepting those facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*

{¶ 17} In general, "[t]he Fourth Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment, as well as Ohio Constitution, Article I, Section 14, prohibit the government from conducting warrantless searches and seizures, rendering them per se unreasonable unless an exception applies." *State v. Goodloe,* 10th Dist. No. 13AP-141, 2013-Ohio-4934, ¶ 6.

{¶ 18} One such exception, recognized by the United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1 (1968), permits a police officer to "stop or detain an individual

without probable cause when the officer has a reasonable suspicion, based on specific, articulable facts, that criminal activity is afoot." *State v. Jones,* 188 Ohio App.3d 628, 2010-Ohio-2854, ¶ 16 (10th Dist.). *See also State v. Cordell,* 10th Dist. No. 12AP-42, 2013-Ohio-3009, ¶ 13, quoting *Terry* at 24 (under *Terry,* "a police officer may conduct a brief warrantless search of an individual's person for weapons if the officer has a reasonable and articulable suspicion that the 'individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others' "). The purpose of such a limited search "is not intended to discover evidence of a crime, but to allow the officer to pursue his duties 'without fear of violence.' " *Id.* at ¶ 13, quoting *Adams v. Williams,* 407 U.S. 143 (1972).

{¶ 19} The warrantless search exception in *Terry* was "expanded to protective searches of automobiles in *Michigan v. Long.*" *Cordell* at ¶ 14. In *Long,* the Supreme Court held that the warrantless search of the passenger compartment of an automobile is permissible "if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049, quoting *Terry* at 21.

{¶ 20} As noted above, the trial court in the instant case determined that the officers made a valid investigative stop based on "testimony that [appellee's] car was the only one in the parking lot where it appeared that the gunshots were being fired from and that an officer came from the direction where [appellee] said the two people ran." (Tr. 41.) The trial court further found, however, that once appellee was under the control of the officers, he had no opportunity to reach the glove compartment and, therefore, the search and seizure of the weapon was not permissible under any exception to the warrant requirement.

{¶ 21} Before considering the state's first assignment of error, challenging the trial court's ruling as to the officers' search of the vehicle, we briefly address appellee's claim that the officers lacked reasonable suspicion to justify the investigative stop of the vehicle in the first instance. We disagree, and find no error with the trial court's determination that it was reasonable to make a brief investigatory stop.

{¶ 22} In general, "an investigative stop of a motorist does not violate the Fourth Amendment if the officer has a reasonable and articulable suspicion that the individual is

engaged in criminal activity." *State v. Richardson,* 9th Dist. No. 21144, 2003-Ohio-246, ¶ 9.

{¶ 23} In support of his argument that the stop was invalid, appellee relies on this court's decision in *State v. Parrish,* 10th Dist. No. 01AP-832, 2002-Ohio-3275, ¶ 22, in which we held that a defendant's "mere presence in the general vicinity where * * * shots allegedly had been fired" did "not provide a reasonable, articulable suspicion that defendant had engaged in criminal activity to justify an investigative stop." We find, however, the facts of *Parrish* to be distinguishable from those in the present case, as the officers making the stop in *Parrish* relied solely upon the dispatch reporting shots fired. In *Parrish,* this court noted that the transcript of the suppression hearing contained no information concerning the dispatch other than a statement that shots had been fired "in the area of East Fifth and Brentnell Avenues," nor did the state establish any specific details regarding the dispatch, including the precise time the shots had been fired, or whether the defendant's vehicle had been observed in the area. *Id.* at ¶ 20.

{¶ 24} By contrast, in the instant case, the officers not only received a dispatch regarding shots being fired in the area of Carstare Court, but the officers themselves, upon arriving at the location and proceeding on foot, heard multiple shots fired approximately 200 feet away. The officers, based on their own observations, believed the shots were coming from the rear of Carstare Court. After arriving at the parking lot, they observed appellee in the only occupied vehicle in the lot, and the officers did not observe any other vehicles entering or leaving the area nor any other individuals on foot. Under these circumstances, the officers had a reasonable suspicion that criminal activity "was afoot" at the time they ordered appellee to exit the vehicle. *See also State v. Fisher,* 10th Dist. No. 10AP-746, 2011-Ohio-2488, ¶ 38 (distinguishing *Parrish* where, "unlike" the facts of *Parrish*, "the officers independently observed circumstances reasonably indicating criminal behavior at the scene of the detention").

{¶ 25} The facts of the instant case are somewhat analogous to those in *State v. Clayton*, 9th Dist. No. 27290, 2015-Ohio-663, in which officers, on patrol at 2:40 a.m., heard several gunshots a few blocks away and started driving toward the direction of the shots. After traveling approximately one block, the officers spotted a GMC Yukon coming from that direction. The vehicle was traveling very slowly and the officers noted that it was the only vehicle on the road and no pedestrians were in the area. The officers stopped

the vehicle and patted down the driver and passenger, at which time the officers observed a handgun.  The defendant filed a motion to suppress, which the trial court denied.

{¶ 26} On appeal, the defendant argued that the police lacked reasonable suspicion to stop the vehicle because there was no evidence it was involved in the shooting, asserting that "the stop amounted to nothing more than a 'stab in the dark.' "  *Id.* at ¶ 16. The reviewing court found no error by the trial court.  In its decision, the court noted that the officers spotted the vehicle "directly after having heard gun shots," citing one officer's testimony that the shots "sounded as if they came from only a few blocks away," and that they did not observe "any other cars or pedestrians in the area."  *Id.*  The court concluded that "[t]he close proximity of the SUV to the area the police were investigating, combined with the recency of the gun shots, the SUV's solitary appearance on the road at that late hour, and its noticeably slow pace amounted to 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed] [the] intrusion.' "  *Id.* at ¶ 17, quoting *State v. Shorts*, 9th Dist. No. 11CA009965, 2011-Ohio-6202, ¶ 9.

{¶ 27} We note that federal courts have also upheld investigative stops under similar circumstances.  *See, e.g., United States v. Raino,* 980 F.2d 1148, 1150 (8th Cir.1992) (*Terry* investigative stop justified where "officers were responding to a late-night call that shots had been fired in precisely the area appellant's car was parked"); *United States v. Brown,* 334 F.3d 1161, 1166 (D.C.Cir.2003) (upholding *Terry* stop by police officers responding to a call of shots being fired in nearby parking lot where facts indicated it was late at night, the area was a high crime area, and there were only two occupied cars in the lot).

{¶ 28} Having determined that the record supports the trial court's finding that the officers had a reasonable suspicion to justify an investigative stop, we next consider whether the trial court erred in its determination that the subsequent search of the passenger compartment was invalid.  As noted, the state contends the trial court applied the wrong doctrine in this case, i.e., that it analyzed the case under the search incident to arrest exception, as recently clarified in the Supreme Court's holding in *Gant,* instead of utilizing the protective-sweep exception as set forth in *Long.*

{¶ 29} By way of background, prior to the Supreme Court's decision in *Gant,* "officers could conduct a warrantless search of 'the passenger compartment of [the

arrestee's] automobile' under [the search incident to arrest] doctrine." *United States v. Polanco,* 634 F.3d 39, 42 (1st Cir.2011), quoting *New York v. Belton,* 453 U.S. 454, 460 (1981). In *Gant,* the Supreme Court "clarified that an automobile search may fall within the search-incident-to-arrest doctrine only in two very specific situations: 'when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search' (the officer-safety justification), or 'when it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle" ' (the evidence-preservation justification)." *Polanco* at 42, quoting *Gant* at 343, 333, quoting *Thornton v. United States,* 541 U.S. 615, 632 (2004). Under the facts of *Gant,* the defendant was already under arrest and seated in the back of the police cruiser at the time officers searched the passenger compartment for drugs, and the Supreme Court held that the search incident to arrest exception "does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." *Id.* at 335.

{¶ 30} The decision in *Gant* "is a limitation on the scope of the 'search incident to arrest' exception to the Fourth Amendment, rather than a limitation on the protective search exception in *Long.*" *United States v. Torres,* (S.D.N.Y. No. 10 CR 1159(JGK)) (June 7, 2011). Thus, "[b]ecause *Gant* dealt specifically with a protective search conducted incident to a custodial arrest, it does not address a protective search conducted during a traffic stop, in which the occupant of the vehicle may return to the car and have access to any weapons inside the vehicle once the stop is over." *Id.* Rather, "*Gant* specifically identified *Long* as an exception to the warrant requirement that would be unaffected by its holding." *Id.*

{¶ 31} In the present case, the trial court specifically noted appellee was not under arrest prior to the search, and Officer Hawkins testified that appellee was going to be released back to his vehicle if no weapon was found. Here, the search of the vehicle was not a search incident to an arrest, and we agree with the state that *Gant* is inapplicable. *See State v. Broughton,* 10th Dist. No. 11AP-620, 2012-Ohio-2526, ¶ 36 (finding *Gant* inapplicable where appellant "was neither under arrest nor in handcuffs while seated in the police cruiser, and would have been returned to his car had the search not revealed the handgun"); *State v. Carr,* 2d Dist. No. 24004, 2011-Ohio-2061, ¶ 35 (where officer testified he would have sent defendant on his way if weapons check of interior of vehicle

had been negative, "[t]his case is therefore within the ambit of *Michigan v. Long* * * * not *Arizona v. Gant*").

{¶ 32} As noted under the facts, the trial court focused on the fact that appellee was under the control of the officers at the time the glove compartment was searched. However, "[t]he *Long* court rejected an argument that it was not reasonable for the officers to fear that Long could injure them because he was effectively under their control during the investigative stop and could not gain access to any weapons that might have been located in the car." *Broughton* at ¶ 24. Rather, the court in *Long* "noted that when the suspect is not placed under arrest and instead will be permitted to return to his or her vehicle, an officer 'remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger." ' " (Emphasis sic.) *Broughton* at ¶ 24, quoting *Long* at 1052, quoting *Terry* at 28.

{¶ 33} In light of the foregoing, we agree with the state that the trial court "erred in applying *Gant* rather than *Long* in determining the reasonableness of the search," and we therefore will "review the facts of the case and apply the correct standard to determine whether suppression of evidence was warranted." *Cordell* at ¶ 15.

{¶ 34} The state argues that a number of factors support the officers' protective search of the vehicle for weapons, including the time of night, the experience of the officers, the fact multiple gunshots had been fired, and appellee's conduct. In response, appellee argues that the state failed to show a reasonably prudent officer, under the circumstances, would have believed his or her safety was in danger.

{¶ 35} In considering the totality of the circumstances, "courts generally consider factors such as the time of day, the experience of the officers involved, and suspicious activities by the defendant both before and during the stop." *Broughton* at ¶ 19.

{¶ 36} In the present case, Officer Hawkins testified that he had four years experience on the police force. As indicated above, "the totality of the circumstances may include the officer's experience on the police force." *State v. Morris,* 10th Dist. No. 09AP-751, 2010-Ohio-1383, ¶ 19. Here, the officers were investigating a dispatch reporting shots fired "shortly after midnight," in an area where Officer Hawkins had previously responded "[m]ultiple times" to reports involving shots fired and weapons. In *Long,* the Supreme Court cited the fact that "[t]he hour was late" as one of the circumstances that

"justified" the officers' "reasonable belief that Long posed a danger if he were permitted to reenter his vehicle." *Id.* at 1050. *See also State v. Peterson,* 2d Dist. No. 14733 (July 7, 1995) ("time of night" a factor in considering whether officer had reasonable belief defendant "might be armed and dangerous"); *State v. Manning,* 6th Dist. No. L-08-1278, 2009-Ohio-2605 ¶ 14 ("surrounding circumstances, such as the time of day or night * * * may increase the danger to the officer").

{¶ 37} Upon arriving near the area, the officers themselves heard the sound of a gunshot, followed by a series of approximately six more gunshots. According to Officer Hawkins, the shots were "200 feet, very close," and "sounded as if they were coming from the rear of Carstare Court." This court has previously cited a defendant's "temporal proximity" to a gunshot as a factor that may provide officers reason to believe a vehicle's occupants were involved in a shooting and that there was a weapon in the vehicle. *See Fisher* at ¶ 35-37. Officer Hawkins further testified that, upon hearing the shots, he was concerned for his safety and the safety of others. As the officers approached that location on foot, they observed a vehicle and heard the engine start. There were no other vehicles entering or leaving the area, nor did the officers observe any other individuals on foot.

{¶ 38} Officer Hawkins and his partner approached the vehicle with their "firearms pointed at the driver" and "giving loud verbal commands to put the vehicle in park, turn off the vehicle." Appellee initially ignored the officers' verbal commands to stop the vehicle; rather, the vehicle was inching forward and "starting to turn." Appellee's failure to "immediately heed" the officers' orders "could have reasonably raised the officers' suspicion that [he] might pose a danger to their safety." *Broughton* at ¶ 20. After stopping the vehicle, appellee then "jumped out of the car," and "looked back at the vehicle multiple times as he exited." He appeared to be "[v]ery nervous," and "was shaking." While "some degree of nervousness during interactions with police officers is not uncommon, * * * nervousness can be a factor to weigh in determining reasonable suspicion." *State v. Atchley,* 10th Dist. No. 07AP-412, 2007-Ohio-7009, ¶ 14. Upon exiting the vehicle, appellee told the officers that he had observed two black males running northbound, and that "they were the ones that did the shooting." Appellee also offered, without any questioning from the officers, a statement that "[t]here is no gun in the car."

{¶ 39} We have previously found, in considering the issue of whether the investigatory stop was proper, that the evidence supported a determination that the officers had a reasonable suspicion criminal activity was afoot at the time they ordered appellee to exit his vehicle.  Upon consideration of the totality of the circumstances, we further conclude that it was reasonable for the officers to conduct a search of the passenger compartment of the vehicle for their safety based upon a "reasonable belief that the suspect [was] potentially dangerous."  *Long* at 1051.  Accordingly, we find that the search was "constitutionally valid."  *Broughton* at ¶ 37. Thus, "applying the correct standard based upon *Long* and *Terry* to the facts described at the suppression hearing," the protective search by the officers "was not illegal and suppression of the evidence obtained thereby was not warranted." *Cordell* at ¶ 23.

{¶ 40} We therefore sustain the state's first assignment of error.

{¶ 41} Based upon this court's disposition of the first assignment of error, the issue raised by the state under its second assignment of error (i.e., whether the trial court erred in failing to address or apply the good-faith exception to the exclusionary rule) is hereby rendered moot.

{¶ 42} Based upon the foregoing, the first assignment of error is sustained, the second assignment of error is rendered moot, the judgment of the Franklin County Court of Common Pleas is reversed, and this matter is remanded to that court for further proceedings in accordance with law and consistent with this decision.

*Judgment reversed and cause remanded.*

SADLER, J., concurs.
TYACK, J., dissents.

TYACK, J., dissenting.

{¶ 43} Since I agree with the trial court's resolution of the pertinent issues, I respectfully dissent.

{¶ 44} The analysis of the legal issues starts with the observation that the police officers had no warrants.  For many, many years, the law of the land has been that warrantless searches and seizures are per se unreasonable. *See Katz v. United States*, 389 U.S. 347 (1967).  As a result, the burden is on the prosecution to come forward with an

argument for the existence of one of the well-delineated exceptions and follow that with proof of the existence of that exception. The state failed to meet that burden in this case.

{¶ 45} The state had to prove an exception that applied to the stopping of Mr. Pinckney's vehicle; an exception that applied to removing him from the vehicle; an exception that applied to the detaining of Pinckney in the way he was detained; and finally, an exception that applied to search of the vehicle at a time when Pinckney was out of the vehicle and totally under the control of the police.

{¶ 46} *Arizona v. Gant*, 556 U.S. 332 (2009), was decided 26 years after *Michigan v. Long*, 463 U.S. 1032 (1983). When *Gant* was decided, it significantly narrowed the scope of *Michigan v. Long*, supra. Despite the efforts of the majority of the panel to find a way to distinguish the facts of the *Gant* case from the facts of this case, *Gant* governs this situation. Pinckney had been ordered out of his vehicle. He had been frisked. He had been placed and "maintained" under the "physical control" of police outside of his motor vehicle. Police then searched the vehicle without a warrant.

{¶ 47} The majority of the panel does not want to call what happened to Mr. Pinckney an arrest. For all pertinent purposes, an arrest occurred. Again, Pinckney was stopped. He was removed from his vehicle. He was frisked. He was placed behind his vehicle. He was held there under police physical control. Pinckney clearly was not free to leave. Simply put, the police control of Pinckney was no different than the police control exercised over Gant in *Arizona v. Gant*, supra. It was far more than an investigative stop.

{¶ 48} The state's attempt to argue that the search of Pinckney's vehicle was necessary for the protection of the officers borders on the absurd. Pinckney would have had to get out of the physical control of Officer Hawkins and overpower Hawkins' partner in order to get to the interior of the vehicle. We are not told all of the particulars, but was Pinckney on his stomach on the ground as a part of the physical control?

{¶ 49} In today's environment, with several high-profile police shootings of civilians in recent history, is it any wonder Pinckney appeared to be nervous and shaking when he was removed from his vehicle? His nervousness is not an indication of any criminal activity.

{¶ 50} I also note that the police officers had no basis for believing that criminal activity was still afoot. The shooting had stopped. No one else was visible in the neighborhood. Pinckney was merely leaving an area where one or more guns had recently

been fired.  Leaving an area where guns have been fired is not a crime.  The assertion in the majority decision at ¶ 39 that the officer had "a reasonable suspicion criminal activity was afoot," is just plain wrong if it means such activity was still going on or was about to continue.

{¶ 51} Again, I believe that the trial court judge got it right when she suppressed the fruits of this warrantless search.  I would affirm her decision.

_____